## MATTER OF DUCKETT

### In Exclusion Proceedings

### A-27683768

*Decided by Board November 4, 1987*

A Canadian citizen railroad clerk employed by a Canadian railroad who seeks to enter the United States on a daily basis for a portion of his shift in order to clear his employer's railroad cars for transport from the United States to Canada is admissible to the United States as a visitor for business under section 101(a)(15)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(B) (1982), as the function he performs is a necessary incident to international trade or commerce. *Matter of L-*, 3 I&N Dec. 857 (C.O., BIA 1950), distinguished.

EXCLUDABLE: Act of 1952—Sec. 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa

ON BEHALF OF APPLICANT:
Kenneth A. Cohen, Esquire
Gellman, Cohen & Grasmick
4043 Maple Road
Buffalo, New York 14226-1037

ON BEHALF OF SERVICE:
James M. Grable
District Counsel

Janice Podolny
Appellate Counsel

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

In a decision dated March 26, 1986, the immigration judge found the applicant admissible to the United States as a nonimmigrant visitor for business. The Immigration and Naturalization Service has appealed from that decision. The appeal will be dismissed.

The applicant is a native and citizen of Canada who resides in that country with his wife and children. He has been employed for the last 18 years as a railroad clerk, first by Conrail Corporation in Canada and, since May 1, 1985, by CP-Rail-CASO in Canada. On February 21, 1986, he sought admission for a portion of his shift to the United States as a nonimmigrant visitor for business in order to clear his employer's railroad cars for transport from Niagara Falls, New York, to Niagara Falls, Ontario. Because he was not clearly admissible, he was placed in exclusion proceedings.

The record reflects that the applicant's employer, CP-Rail-CASO, is a wholly-owned subsidiary of Canadian Pacific Rail, a transcontinental railway operating in Canada with access to international markets in the United States. CP-Rail-CASO is involved in international rail transportation, as less than 5 percent of its activities are domestic transportation within Canada. In May 1985, Canadian Pacific Railroad and the Canadian National Railroad succeeded in purchasing the Canadian assets of Consolidated Rail Corporation (Conrail) plus certain assets in the United States. The United States assets included the Niagara River Bridge across the Niagara River between Niagara Falls, New York, and Niagara Falls, Ontario, and 8/10 of a mile of track from the American side of the bridge in Niagara Falls, New York, to Conrail's Niagara Falls, New York, yards. In order to facilitate the international rail transportation of goods in international commerce, CP-Rail-CASO and Conrail entered into an interchange agreement which permitted CP-Rail-CASO to obtain cars set out for its transportation to Canada at Conrail's Niagara Falls, New York, yard. From May 1985 until July 1985, Conrail's clerks prepared documentation and instructions which enabled CP-Rail-CASO train crews to move the cars across the border into Canada. In June 1985, Conrail notified CP-Rail-CASO that it would no longer provide the clerical functions which enabled the train to move in international commerce. As a result of this action, the applicant was assigned to the United States in July 1985 until January 1986 on a full-time basis to train for the responsibilities of rail clerk, as they relate to clearing trains for crossing the international border, and to gain familiarity with the various problems which occur in the rail transportation of goods in international commerce.

In support of his application for admission, the applicant presented a detailed account of his responsibilities as a railroad clerk. Since January 1986, the applicant reports to work at CP-Rail-CASO's Montrose yard in Niagara Falls, Ontario. He obtains documents related to the international shipment for his use in the United States and performs other responsibilities. When Conrail calls CP-Rail-CASO to advise them the train is leaving its Buffalo yard for Niagara Falls, New York, the applicant uses the company truck to drive to Conrail's Niagara Falls, New York, yard. Once he arrives at Conrail he drives to the eastern portion of the yard to do a rollby check of the train. In this check he compares the cars actually being delivered to those appearing on the consist [1] and also

---

[1] A consist is a list of all the cars on a train, their destination, and other information.

conducts a preliminary safety check of the condition of the train. He then gives his finding to the Conrail crew. The Conrail crew makes any appropriate changes and enters that information into its computer. Conrail then utilizes the updated information to provide the applicant with an accurate list of the cars that were just transported and the cars already in the yard awaiting transport to Canada. Conrail also provides him with the waybills [2] for each car and all customs and other documentation it has relating to those cars.

In his employment, the applicant reviews the documentation he brought from Canada and the documentation delivered to him by Conrail to ascertain that each car has proper documentation to move in international commerce. He instructs the crew to marshall the train correctly and prepares customs export declarations and other documentation for those cars lacking such documentation. He also transmits information about the cars on the train to CP-Rail-CASO so that his employer may enter information relating to those cars into its computer system. The applicant then leaves the documentation and instructions for CP-Rail-CASO's train crew and returns to Canada. If the United States Customs Service desires to inspect any cars on the train leaving the United States he returns from Canada to the border in order to open the cars. (Traditional security measures in union contracts prohibit the train's crew from opening the cars for customs inspections.) On his return to Canada the applicant spends 70 percent of his time performing additional clerical work on the same train. He helps complete the data processing, helps with Canadian customs manifesting, and conducts a rollby check of the train when it arrives from the United States. Out of each shift he spends between 2 and 3 hours in the United States and between 5 and 6 hours of his time in Canada. He is the only employee regularly assigned to this duty.

The applicant maintains that his employment requires a high degree of expertise which is usually obtained after 4 or more years of on-the-job training. Safety is the utmost consideration of a railroad clerk's job. He must know how to walk safely in the yard and must learn public safety regulations. Governmental regulations define dangerous cargo, control placement of cars containing dangerous cargo, and control the safe capacities of cargo a car may contain. The clerk must be able to identify dangerous cargo, place the car carrying it correctly and safely in the train, spot overloads, and alert the yard manager so CP-Rail-CASO may take corrective

---

[2] A waybill is the document on which a car moves. It contains the car numbers, cargo, destination, and other information.

action. Moreover, once the applicant's employer accepts cars, it is legally bound by their condition and may be fined substantial amounts if it accepts and transports rail cars that are unsafe, undocumented, or overloaded or otherwise violate applicable rail transportation regulations. The clerk must visually compare the rail cars with the waybill, check their condition, and provide CP-Rail-CASO with the information necessary to decide whether to accept or reject the cars. He must also prepare a consist and assist the train crew to clear the goods through United States and Canadian customs. The applicant also points out that customary railroad practices, both in the United States and Canada, prohibit these functions from being performed by the train's operating crew.

In his consideration of the applicant's request for admission, the immigration judge applied a two-pronged test for admissibility, as visitors for business, of employees of common carriers engaged in international trade or commerce in accordance with *Matter of Camilleri*, 17 I&N Dec. 441 (BIA 1980). The immigration judge found that the applicant possessed a clear intent to continue his residence in Canada and to maintain his domicile there. He also determined that the applicant's entries into the United States were, individually or separately, of a plainly temporary nature, being only so long as required to permit transfer of a train from Conrail to the applicant's employer. In his review of the applicant's case, the immigration judge also distinguished the holding in *Matter of L–*, 3 I&N Dec. 857 (C.O., BIA 1950), which involved a relief telegrapher, employed by Canadian Pacific R.R. 3 days a week in Canada and 2 days a week in the United States, who was precluded from entering the United States as a nonimmigrant visitor because the work involved was of a permanent and continuing nature performed at a fixed place of employment pursuant to a regular assignment. The immigration judge found that *Matter of L–, supra*, was inapplicable because it did not consider the effect of employment by a common carrier engaged in international commerce.

On appeal, the Service urges reversal of the immigration judge's decision. It maintains that the applicant is coming to the United States solely to perform purely local employment or labor for hire as a railroad clerk, who is not otherwise qualified for entry as a business visitor, because the function he performs is not a necessary incident to international trade or commerce. The Service contends that, unlike the truck driver in *Matter of Cote*, 17 I&N Dec. 336 (BIA 1980), whose manual labor activities such as loading and unloading were deemed to be a necessary function of delivery and were merely incidental to his primary business activity of transpor-

tation, the applicant's clerical duties are his only business activities, and he is not coming to the United States, as does a truck driver or a train crew member, in the act of transporting goods across the border. The Service argues that the immigration judge improperly adopted the test of admissibility set forth in *Matter of Hira,* 11 I&N Dec. 824 (BIA 1965, 1966; A.G. 1966), and reiterated in *Matter of Camilleri, supra,* rather than focusing on the nature of the activity to be performed by the applicant, which was, the Service maintains, the approach applied in *Matter of Cote, supra,* and *Matter of Camilleri, supra.*

In his response on appeal, the applicant likens his job to that of a navigator on an airplane and stresses the importance of his function for the transport of goods in international commerce. In support of this position, the applicant points out that in *Matter of R-,* 3 I&N Dec. 750 (BIA 1949), a helper employed by a Canadian company on a moving van, coming to load and unload household goods, was found admissible because his position was equivalent to an operating crew member. The applicant also states that he has a home in Canada which he does not intend to abandon, that the bulk of his work and payment by his Canadian employer for his services occurs in Canada, and that each of his entries is clearly temporary, lasting for only a few hours of his shift, in contrast to the telegrapher in *Matter of L-, supra,* or the employee of a Canadian company in *Matter of G-,* 6 I&N Dec. 255 (BIA 1954), who worked fulltime at his employer's facility in the United States as a receiving clerk and loader.

Section 101(a)(15)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(B) (1982), defines a nonimmigrant visitor for business as

> an alien (other than one coming for the purpose of study or of performing skilled or unskilled labor or as a representative of foreign press, radio, film, or other foreign information media coming to engage in such vocation) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business.

The term "business" as used in section 101(a)(15)(B) has been held not to include ordinary labor for hire, but to include only intercourse of a commercial character. *See Karnuth v. United States ex rel. Albro,* 279 U.S. 231 (1929); *Matter of Hira, supra; Matter of P-,* 8 I&N Dec. 206 (BIA 1958). However, an alien need not be considered a "businessman" to qualify as a business visitor if the function he performs is a necessary incident to international trade or commerce. *Matter of Hira, supra; see also Matter of W-,* 6 I&N Dec. 832 (BIA 1955); *Matter of R-, supra.*

Based upon our review of the record, we find that the applicant is engaged in "business" within the meaning of section 101(a)(15)(B) of the Act because the function he performs is a necessary incident to international trade. Focusing on the applicant's activities, we find that the applicant is engaged in the transportation of goods across the international boundary. The functions which the applicant performs in his job as a railroad clerk in the United States are in many ways as crucial as the duties performed by the train engineer for the movement of the train and the transportation of goods across the border. The applicant is not precluded from establishing his admissibility by the fact that he is not a member of the train's operating crew. In *Matter of R–, supra,* the Board found admissible a helper on a moving van engaged in international commerce whose function was to load and unload goods, finding that he was equivalent to an operating crew member. In the present case, the applicant performs certain duties, such as the opening of cars for inspection purposes, which require his presence in the same way the presence of an operating crew is required for the movement of the train. We note that, although the applicant is precluded from riding the train as a member of the operating crew by traditional distinctions between a railroad's operating crew and its clerical support staff, he essentially escorts the train across the border, spending the bulk of his shift both in the United States and Canada clearing a particular train for transport across the border. Because the record shows the applicant performs duties without which the train would not physically be permitted to cross the international boundary, we do not find the distinctions between the train's operating crew and the applicant's clerical support functions controlling in the present case.

In our consideration, we also do not find fatal to the applicant's request for admission the fact that his duties are performed on a regular and permanent basis at a fixed place of employment in the United States. The applicant does not spend his entire shift in the United States. *Cf. Matter of G–, supra.* It has also been held permissible to engage in duties in the same location in the United States on a routine (although not full-time) basis where such duties are an integral part of international transportation of goods. *See Matter of W–, supra.* We note that in *Matter of L–, supra,* a relief telegrapher for an international carrier who was regularly assigned to this country 2 days a week was precluded from entry to the United States because he engaged in work of a permanent and continuing nature, which was to be performed at a fixed place of employment pursuant to a regular assignment. In that case, however, it was not apparent that the applicant performed a duty of any

498



significance for international transportation of goods. In the present case, we find it indisputable that the applicant is directly involved in the movement of goods across the international border.

Because we find that the applicant is admissible as a nonimmigrant visitor for business, the appeal will be dismissed.

**ORDER:** The appeal is dismissed.