**Claude ROBERT, Petitioner–Appellant,**

v.

**Janet RENO, Attorney General; Immigration and Naturalization Service, Respondents–Appellees.**

No. 00–3966.

United States Court of Appeals, Sixth Circuit.

Jan. 10, 2002.

---

Before SUHRHEINRICH and COLE, Circuit Judges; COLLIER, District Judge.*

SUHRHEINRICH, Circuit Judge.

Petitioner is a Canadian citizen and operates a Canadian trucking company. Petitioner's company stored paper that it brought into the United States from Canada in a warehouse in Michigan. Petitioner attempted to use a B–1 temporary business visa to deliver the paper from the warehouse in Michigan to other places within the United States. The Board of Immigration Appeals ("BIA") held that Petitioner could not use a B–1 visa to deliver the paper products from the warehouse to other points within the United States. Petitioner appeals a decision of the Board of Immigration Appeals ("BIA") affirming the denial of a temporary business visa by an immigration law judge. We AFFIRM the decision of the BIA for the following reasons.

---

* The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

## I. BACKGROUND

Petitioner Claude Robert is a Canadian citizen and president of Transport Robert Ltée ("TRL"), a Canadian trucking company, that operates in Canada and internationally between points in Canada and the United States. TRL's major client is Domtar, a Canadian paper manufacturer. Each year, TRL's Canadian drivers carry about 720,000 tons of Domtar paper to the United States. These drivers deliver about 576,000 tons directly from Canada to buyers in various cities in the United States. However, since 1993, TRL's drivers have delivered the remaining 144,000 tons to TRL's affiliated warehouse in Taylor, Michigan. About half of this paper is "cross-docked," i.e., unloaded and then reloaded on trucks and delivered to fill orders within the United States. The rest of this paper is unloaded and stored at the warehouse to fill future orders.

TRL's drivers enter the United States as business visitors on B–1 visas. A "B–1 business visitor" is a person "having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily on business." 8 U.S.C. § 1101(a)(15)(B). Under the Immigration and Nationality Act (the "INA"), 8 U.S.C. §§ 1101–1537, drivers with B–1 visas may deliver goods in the United States as long as they engage in a continuation of international transportation and do not engage in "purely domestic service or solicitation, in competition with United States operators." 8 U.S.C. § 1101(a)(15)(B).

On July 21, 1995, Petitioner asked the Associate Commissioner of the Immigration and Naturalization Service ("INS") of the United States if it were legal to use Canadian truck drivers with B–1 visas to deliver paper from the Michigan warehouse to other points within the United States. On October 25, 1995, Yvonne M. LaFleur, then Chief of Nonimmigrant Branch Adjudications for the INS, explained in a letter that Plaintiff's Canadian truck drivers could not "cabotage," i.e., haul freight point-to-point within the United States, as "B–1 business visitors" under the INA. The LaFleur Letter explained that:

the Canadian driver is not performing international transport, even though the goods themselves may have originated in Canada. Regardless of the origin of the goods, the driver is not transporting that load either into or out of the country, but transporting the load from one point in the United States to another point in the United States. In effect, the Canadian driver is both loading and unloading goods within the United States, which constitutes cabotage or point-to-point hauling within the United States. In addition, the interchange of trailers in this situation constitutes a break in the continuous international movement of goods such that the portion of the transport within the United States is interposed as a domestic movement of goods, or cabotage.

On March 8, 1996, TRL sought a declaratory judgment and injunctive relief in the District Court for the District of Columbia so that its drivers could deliver paper from the Michigan warehouse to points within the United States because those deliveries were part of international commerce. The district court determined that the LeFleur letter was not a final decision under the Administrative Procedure Act, 5 U.S.C. § 551, and remanded the case to the INS for further action. *Transport Robert (1973) LTEE v. U.S. I.N.S.*, 940 F.Supp. 338, 342 (D.D.C.1996).

On remand, Petitioner and the INS agreed to a "test case" in which Petitioner, a licensed truck driver, would present himself to the INS at the border representing that he intended to deliver paper from his

warehouse in Michigan to points within the United States using his B–1 visa. The INS excluded Petitioner under 8 U.S.C. § 1182(a)(5)(A)(i) [1] for seeking to enter the United States to work without a labor certificate and under 8 U.S.C. § 1182(a)(7)(A)(i)(I) [2] for seeking to enter the United States without a valid visa. After an exclusion hearing, an immigration judge held that deliveries within the United States of paper that had been stored in the Michigan warehouse using a B–1 visa were illegal under 8 C.F.R. § 214.2(b)(4)(i)(E)(1). The BIA affirmed the decision of the immigration judge. Petitioner appeals from the BIA to this Court under 8 U.S.C. § 1252(a)(1).

## II.   Discussion

■■■ Petitioner raises two issues on appeal. First, Petitioner contends that INS's use of a test case to provide a final ruling on a business related immigration issue should be set aside under the Administrative Procedures Act ("APA") because it unreasonably delayed final agency action and was arbitrary and capricious. *See* 5 U.S.C. § 706. Although the District Court for the District of Columbia sympathized with Petitioner's predicament, *see Transport Robert*, 940 F.Supp. at 341–342 (stating that an "agency must be more respon-

sive to those it regulates"), we must reject his claim. The APA simply does not govern immigration proceedings under the INA and may not be used to challenge the hearing provisions of the INA. *Ardestani v. I.N.S.*, 502 U.S. 129, 132, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991)(holding that INA "expressly supersedes" hearing provisions of the APA); *Marcello v. Bonds*, 349 U.S. 302, 309, 75 S.Ct. 757, 99 L.Ed. 1107 (1955) (holding that the hearing provisions of the INA supersede the provisions of the APA). Moreover, after the remand from the district court for the District of Columbia to the INS, Petitioner essentially waived this issue by agreeing to resolve this matter by submitting to the exclusion proceeding, the hearing before the immigration judge, and the appeal to the BIA. Accordingly, Petitioner's attack on the INA's procedure fails.

■■■ Second, Petitioner contends that the BIA's decision is manifestly contrary to law. This Court reviews the BIA's legal conclusions de novo with substantial deference to its reasonable interpretations. *Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986); *Hamama v. I.N.S.*, 78 F.3d 233 (6th Cir.1996). An agency interpretation of its regulation controls unless it is plainly erroneous or

---

1. 8 U.S.C. § 1182(a)(5)(A)(i) provides the following:

> Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor is inadmissible, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that—
> (I) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled.labor, and
> (II) the employment of such alien will not adversely affect the wages and working

conditions of workers in the United States similarly employed.

2. 8 U.S.C. § 1182(a)(7)(A)(i)(I) provides the following:
> Except as otherwise specifically provided in this chapter, any immigrant at the time of application for admission—
> (I) who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title . . . is inadmissible.

inconsistent with the regulation. *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *I.N.S. v. Aguirre–Aguirre,* 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (quoting *I.N.S. v. Abudu,* 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)); *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977).

A B–1 business visitor to the United States is an alien who has a residence in a foreign country, has no intention of abandoning it, and is temporarily visiting the United States for "business." 8 U.S.C. § 1101(a)(15)(B). The term "business," as used in 8 U.S.C. § 1101(a)(15)(B), refers to conventions, conferences, consultations and other legitimate activities of a commercial or professional nature. It does not include local employment or labor for hire. 22 C.F.R. § 41.31(b)(1). Thus, a B–1 business visitor may not perform purely local labor for hire.

The INS excluded Petitioner under 8 C.F.R. § 214.2(b)(4)(i)(E)(1). This section identifies business visitors who may enter the United States on a B–1 visa and work as "transportation operators" in international commerce under the North American Free Trade Agreement ("NAFTA"). Section 214.2(b)(4)(i)(E)(1) provides:

> Transportation operators transporting goods or passengers to the United States from the territory of another Party or loading and transporting goods or passengers from the United States to the territory of another Party, with no unloading in the United States, to the territory of another Party. (These operators may make deliveries in the United States if all goods or passengers to be delivered were loaded in the territory of another Party. Furthermore, they may load from locations in the United States if all goods or passengers to be loaded will be delivered in the territory of another Party. Purely domestic service or solicitation, in competition with the United States operators, is not permitted.)

> 8 C.F.R. § 214.2(b)(4)(i)(E)(1).

The immigration judge and the BIA applied § 214.2(b)(4)(i)(E)(1) to the facts of this case and upheld Petitioner's exclusion because Petitioner represented that he would load paper from the warehouse in Michigan and deliver it to other places within the United States. We find this to be a plain reading of the regulation and a direct application of it to the facts of this case. We also note that this is the same analysis contained in the letter of October 25, 1995, from LaFleur to Petitioner.

Petitioner, however, contends that this interpretation is manifestly contrary to law. Petitioner argues that, in the context of current shipping practices, the Michigan warehouse where TRL stores paper is not a destination but only an intermediate point in the shipment of its cargo and does not break the continuous transportation of goods in international commerce. Petitioner relies on *The Quaker Oats Co.- Transp. Within Texas and California,* 4 I.C.C.2d 1033, 1043 (1987), which states:

> [I]t is well-settled that, where a warehouse serves only as a temporary storage to permit orderly and convenient transfer of goods in the course of what is intended as a continuous movement to destination, the continuity of the movement is not broken at the warehouse.

*Quaker,* 4 I.C.C.2d at 1044–45. Arguably, Petitioner is correct that *Quaker* reflects the practices of the current freight transportation industry, such as distribution

centers and just-in-time delivery. But *Quaker* is distinguishable from the present case because *Quaker* deals with issues of interstate and intrastate state shipping, not with international commerce where issues of immigration, labor supply, and politics are involved. *Id.* at 1038, 1041–43. Further, even assuming that *Quaker* reflects contemporary distribution and shipping practices it does not render the BIA's interpretation "plainly erroneous" or "inconsistent" with the regulation. *Auer*, 519 U.S. at 461, 117 S.Ct. 905; *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778.

Petitioner also challenges the BIA's claim that it focuses on "the movement of goods or passengers" and not the "overall nature" of a "continuation of an international transaction." Petitioner relies on examples that are taken from a handout, a memo, and a case to show that the BIA does in fact consider the international character of the transaction in deciding cases. First, he offers a seminar "handout" distributed by a senior INS representative in Montreal on October 20, 1999, in which the INS does not permit a driver with a B–1 visa to transport an empty trailer within the United States if it is not part of an international trip, but does permit the driver to transport the trailer if the trailer is part of an international trip. INS Memorandum, "Entry of Commercial Truck Drivers into the United States, October 1999." Petitioner also cites an example from the "handout" where a relay driver need not enter the country at the same time as a truck, but within a reasonable period of when the truck did. *Id.* at 36.

Petitioner further relies on a legal opinion of the general counsel of the INS to an assistant commissioner of the INS in which a tour bus driver is permitted to pick up passengers in California and deliver them to Alaska. Petitioner claims that this legal opinion permitted point-to-point delivery within the United States.

However, Petitioner ignores the fact that this tour bus was part of an international tour package offered by a German tour company. The tour originated in Frankfurt, Germany, with a flight to San Francisco, and bus travel through Canada to Anchorage, Alaska, with a return flight to Frankfurt. Legal Opinion re: HQ 235–C Memorandum of September 30, 1993: Intermodal Transportation of Goods and Passengers Through the United States, October 22, 1993. Petitioner also relies on *Matter of Duckett*, 19 I & N Dec. 493, where the INS permitted a Canadian rail clerk to enter the United States to perform paperwork relating to international rail shipments as a "necessary incident to international trade."

While these examples arguably do show that the BIA does consider the international character of the challenged event or transaction, these examples do not establish binding precedent so that the BIA's interpretation is manifestly contrary to law.

Finally, Petitioner contends that the BIA's interpretation of § 214.2(b)(4)(i)(E)(1) is wrong and maintains that the last sentence of § 214.2(b)(4)(i)(E)(1) actually permits "intra-U.S. continuation of foreign shipment activity." (Petitioner's Brief at 26). The last sentence states: "Purely domestic service or solicitation, in competition with the United States operators, is not permitted." Petitioner argues that this sentence distinguishes "purely domestic" freight from "international freight, temporarily at rest at a distribution warehouse (or some similar situation involving international freight), else it would have been mere surplusage." Petitioner reasons that because immigration law does not define the terms "purely domestic" and "international commerce," this Court can define them in the spirit of NAFTA to enhance the free flow of inter-

national commerce without violating the deference owed to the BIA under *Chevron.*

Although Petitioner's position may more accurately reflects the current practices in the transportation industry, he does not show that the BIA's interpretation of § 214.2(b)(4)(i)(E)(1) is plainly erroneous or inconsistent with the regulation. *Auer,* 519 U.S. at 461, 117 S.Ct. 905 , 137 L.Ed.2d 79(1997); *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. Consequently, he cannot prevail on his claim.

### III.   CONCLUSION

Under *Lyng* and *Hamama,* this Court defers to an agency's reasonable interpretation of the regulations that it is charged with administering.   Under *Auer* and *Chevron,* we defer to an agency's interpretation of its regulation unless that interpretation is plainly erroneous or inconsistent with the regulation.   We find that the BIA's interpretation of the regulation is reasonable because it is a plain reading and straight-forward application of the text to the facts of this case.   Further, we find that the BIA's interpretation controls because it is not plainly erroneous or inconsistent with the regulation.   Accordingly, we AFFIRM the BIA's decision.