TRANSPORT ROBERT (1973) LTEE., et al., Plaintiffs,

v.

U.S. IMMIGRATION AND NAT-URALIZATION SERVICE, et al., Defendants.

No. CIV.A. 01–0158(JR).

United States District Court, District of Columbia.

April 17, 2002.

Jeremy Kahn, Kahn and Kahn, Washington, DC, for Plaintiffs.

Peter S. Smith, Special Assistant U.S. Attornet, Washington, DC, for Defendants.

### MEMORANDUM

ROBERTSON, District Judge.

Nineteen Canadian trucking companies, frustrated by the Immigration and Naturalization Service's refusal for many years to provide guidance on what Canadian truckers may and may not do while driving in the United States on B–1 business visas, sued for a judicial declaration of what the rules are in a number of situations and scenarios. On March 29, 2002, I granted defendants' motion to dismiss and denied plaintiffs' motions for summary judgment, after concluding that declaratory relief is not available to answer questions about scenarios. This memorandum sets forth the reasons for that order.

### Background

In the last two decades, the trucking industry has come to rely heavily on intermediate distribution warehouses and just-in-time delivery as their customers have changed their storage practices. The U.S. Customs Service and the (now defunct) Interstate Commerce Commission acknowledged these changes with regard to trucking equipment and cargo involved in interstate and international transportation, see, e.g., 19 C.F.R. §§ 10.41a(f), 10.41a(g), 123.14(c)(1); Quaker Oats Co.—Transportation Within Texas & California, 4 I.C.C.2d 1033, 1043–45 (1987), but the Immigration and Naturalization Service has not made corresponding changes in its rules for Canadian truck drivers who enter the United States on B–1 business visas.[1] INS promulgated regulations for Canadian truck drivers in 1989 and 1994, pursuant to the U.S.-Canada Free Trade Agreement and the North American Free Trade Agreement, but the plaintiffs have been attempting unsuccessfully for the last seven years to obtain additional guidance on those rules.[2]

In 1995, plaintiff Transport Robert (1973), Ltee., received a letter from the Chief of Nonimmigrant Branch Adjudications stating that Transport Robert's Canadian drivers would not be permitted to transport Canadian-manufactured paper from the company's Michigan distribution warehouse to other points in the United States. The company sued under the Administrative Procedure Act. The INS responded that the letter was not final agency action and that Transport Robert would have to present a driver at the border, who would be denied entry for attempting "cabotage" within the United States, and then

1. A B–1 business visitor is "an alien (other than one coming for the purpose of study or of performing skilled or unskilled labor ...) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business ...." 8 U.S.C. § 1101(a)(15)(B).

2. The current regulations describe visitors who may enter the U.S. on B–1 business visas and work as "transportation operators" under NAFTA as those "transporting goods or passengers to the United States from the territory of another Party or loading and transporting goods or passengers from the United States to the territory of another Party, with no unloading in the United States, to the territory of another Party, with no unloading in the United States, to the territory of another Party. (These operators may make deliveries in the United States if all goods or passengers to be delivered were loaded in the territory of another Party. Furthermore, they may load from locations in the United States if all goods or passengers to be loaded will be delivered in the territory of another Party. Purely domestic service or solicitation, in competition with the United States operators, is not permitted.)" 8 C.F.R. § 214.2(b)(4)(i)(E)(1).

challenge the denial of entry.[3] A denial of entry under such circumstances has serious consequences for a driver, who can be excluded from the United States until his or her case is resolved. Judge Sporkin agreed that the INS letter was not a final agency action, but he described the agency's insistence that challenges be brought on an individual basis through the exclusion process as "unacceptable and indeed, unconscionable at this time in this nation's history." *Transport Robert (1973) LTEE v. United States Immigration & Naturalization Serv.*, 940 F.Supp. 338, 342 (D.D.C. 1996).

Subsequently, rather than subject one of his drivers to exclusion, Claude Robert, owner of Transport Robert, presented himself at the border as a test case. He spent more than five years appealing the INS decision. *Robert v. Reno*, 2002 WL 59670, 25 Fed. Appx. 378 (6th Cir.2002). While the appeal was still pending, Transport Robert and eighteen other companies brought this suit. Since INS still had issued no guidance (let alone final agency action that could be challenged directly if unfavorable to the plaintiffs), the suit seeks declaratory judgments on nine different scenarios:

- the use of another Canadian as a relief driver while en route to a United States destination;
- switching trailers with another Canadian driver when both are making deliveries in the United States or both in Canada;
- several types of "deadheading," or driving empty trailers between points

within the U.S. or back to Canada; and

- four types of intra-U.S. moves, including taking one trailer from Canada to a United States warehouse, and then a second trailer of Canadian goods from the warehouse to its final U.S. destination.

Claude Robert lost his individual case in January 2002 when the Sixth Circuit held that INS's interpretation of 8 C.F.R. § 214.2(b)(4)(i)(E)(1) was entitled to deference. *Id.* A month later, plaintiffs' counsel learned that, back in September 2001, INS had promulgated a new chapter in its field investigators' handbook concerning truckers on B–1 business visas.[4] The parties now agree that the handbook addresses nearly all of the plaintiffs' scenarios—but the INS maintains that the handbook is merely informal policy guidance and is not subject to judicial review.

## Analysis

Most federal agencies have accepted and seem to understand that they exist to serve the public. The INS, however, exhibits quite a different attitude, at least to the non-U.S. public, and its position in this case gives new meaning to the term bureaucratic frustration. The INS insists that determining which trucking activities are legal is so intensively fact-specific that the only way to make authoritative decisions is through one-by-one exclusion adjudications. Yet it now takes the position that its field investigators' handbook makes the plaintiffs' claims moot—even though the INS did not bother to inform the plaintiffs or the Court, let alone the broader trucking industry, of the new

---

3. INS procedures have since changed to provide for an "expedited removal" at the border, with limited judicial review available under 8 U.S.C. § 1252(e)(2) and (e)(3), and for full-blown removal proceedings against aliens who are caught in the United States violating the conditions of their non-immigrant status, with more extensive judicial review under other provisions of 8 U.S.C. § 1252. *See* 8 U.S.C. §§ 1225(b)(1), 1227(a)(1)(C).

4. He found a posting concerning the new guidance on the American Immigration Lawyers Association website.

guidance chapter's existence. The agency also fiercely resists the idea of issuing advisory adjudications, refusing to follow the lead of agencies such as the Internal Revenue Service and the Customs Service, which long ago established expedited processes for obtaining agency guidance in advance of proposed courses of action. *See* 26 C.F.R. § 601.201; 19 C.F.R. §§ 177 *et seq.*

The INS' refusal to work with parties who are in good faith attempting to determine and comply with American law seems contrary to the spirit of NAFTA and is needlessly wasteful of the resources of the courts, the plaintiffs, and the INS itself. Even when the agency has provided guidance such as the handbook, it has appeared "to hide behind justiciability as a means to avoid review." *Transport Robert (1973) LTEE v. United States Immigration & Naturalization Serv.*, 940 F.Supp. 338, 342 (D.D.C.1996).

Nevertheless, a declaratory judgment is inappropriate in this case. The Declaratory Judgment Act does not waive the sovereign immunity of the United States government, *Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228, 1230 (1st Cir.1996); *Benvenuti v. Dep't of Defense*, 587 F.Supp. 348, 352 (D.D.C.1984),[5] and may not be used "to preempt and prejudice issues that are committed for initial decision to an administrative body or special tribunal any more than [declaratory judgment actions] will be used as a substitute for statutory methods of review.... Responsibility for effective functioning of the administrative process cannot be thus transferred from the bodies in which Congress has placed it to the courts." *Pub. Serv. Comm'n of Utah v.*

*Wycoff Co.*, 344 U.S. 237, 246–47, 73 S.Ct. 236, 97 L.Ed. 291 (1952). Even where there are no sovereignty or separation of powers concerns, the Act does not authorize courts to render advisory opinions telling parties what the law would be based upon "a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 325, 56 S.Ct. 466, 80 L.Ed. 688 (1936).

Even if this case were justiciable, a declaratory judgment would not be an appropriate use of the Court's discretion. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286–87, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). The plaintiffs are seeking to have the Court rule on a wide variety of hypothetical situations which would "necessarily involve[ ] extensive judicial promulgation of definitive standards best reserved to the expertise of the [administrative agency]," *W.J. Dillner Transfer Co. v. McAndrew,* 226 F.Supp. 860, 863 (W.D.Pa.1963), particularly since judicial deference is especially appropriate in the immigration context because the courts are not well-equipped to take primary responsibility for assessing the political and foreign relations repercussions of new standards. *Immigration & Naturalization Serv. v. Aguirre–Aguirre,* 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). The Declaratory Judgment Act does not authorize this Court to compel final agency action or to promulgate rules or issue advisory adjudications under its own authority.

### *ORDER*

Having considered the parties' briefs and oral arguments, it is this _____ day of March 2002

---

**5.** The Administrative Procedure Act does waive sovereign immunity to allow courts to review final agency actions and to issue declaratory judgments and other equitable relief, *Hubbard v. Environmental Protection*

*Agency,* 949 F.2d 453, 462 (D.C.Cir.1991), but plaintiffs bring this case directly under the Declaratory Judgment Act and not under the APA.

ORDERED that defendants' motion to dismiss the complaint [# 31] is **granted**. And it is

FURTHER ORDERED that plaintiffs' motions for summary judgment [# 26, # 48] are **denied**.

A memorandum will follow.