# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 4, 2021        Decided June 25, 2021

No. 20-5163

OVERDEVEST NURSERIES, L.P.,
APPELLANT

v.

MARTIN WALSH, IN HIS OFFICIAL CAPACITY AS UNITED STATES
SECRETARY OF LABOR, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-01347)

---

*Monte B. Lake* argued the cause for appellant. With him on the briefs was *Christopher J. Schulte*.

*Aaron S. Goldsmith*, Trial Attorney, U.S. Department of Justice, argued the cause for appellees. On the brief were *Jeffrey Bossert Clark*, Acting Assistant Attorney General, *Glenn M. Girdharry*, Assistant Director, and *Matthew J. Glover*, Senior Counsel to the Assistant Attorney General.

Before: SRINIVASAN, *Chief Judge*, WILKINS, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Appellant Overdevest Nurseries, L.P. ("Overdevest"), is a plant nursery based in New Jersey. Overdevest has participated in the H-2A program since 1999, which allows it to bring in qualified foreign workers on temporary visas when there is a lack of qualified U.S. workers. In 2016, the Department of Labor determined that Overdevest had violated regulations governing the H-2A program. Overdevest challenged the regulations in District Court, arguing that they were an impermissible interpretation of the statute and were arbitrarily promulgated and enforced against Overdevest. The District Court granted the Department of Labor's motion for summary judgment. We now affirm the District Court.

**I.**

The United States has long provided temporary work authorization for foreign agricultural workers. Often facing a shortage of U.S. workers willing to perform agricultural work, the United States brings foreign agricultural workers temporarily to the United States. The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1537, has governed temporary work authorization since 1952. Under the INA, employers may temporarily hire foreign workers "when there are not enough qualified and available American workers to fill open jobs" through the H-2A program. *Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014); *see also* 8 U.S.C. § 1101(a)(15)(H)(ii)(a). To participate in the H-2A program, an employer must first certify to the Secretary of Labor that:

A. there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, ["subsection A"] and

B. the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed ["subsection B"].

8 U.S.C. § 1188(a)(1)(A)–(B). Only after the Department of Labor ("Department") has certified the petition can the employer petition the Department of Homeland Security to designate foreign workers as H-2A workers. *Mendoza*, 754 F.3d at 1007. Congress directed the Secretary of Labor ("Secretary") to promulgate regulations that would set the parameters of the program, particularly for temporary workers coming "to perform agricultural labor or services." 8 U.S.C. § 1101(a)(15)(H).

Pursuant to this authority, the Secretary promulgated regulations to protect American workers. Under these regulations, employers must pay the adverse effect wage rate to both H-2A workers and non-H-2A workers, which is the average hourly wage for agricultural workers as reported by the USDA. 20 C.F.R. § 655.103(b); *id.* § 655.120(a); *id.* § 655.122(l). The adverse effect wage rate provides a wage floor that aims to prohibit employers from underpaying foreign workers and thereby depressing wages for similarly-employed American workers. *See Mendoza*, 754 F.3d at 1008. Employers must also pay the adverse effect wage rate to workers engaged in "corresponding employment." 20 C.F.R. § 655.103(b); *id.* § 655.122(l). The definition of "corresponding employment" is the basis for the instant dispute.

In 2010, the Secretary amended the regulations defining "corresponding employment." The 2008 rule had limited the regulation's reach to newly-hired workers in the same "occupations" as the H-2A workers, and it permitted employers to staff H-2A workers for up to twenty percent of their time on

less-skilled work that was incidental to the skilled work they were hired to perform. As a result, the 2008 rule did not require employers to pay the adverse effect wage rate to U.S. workers hired prior to the H-2A workers or to less-skilled U.S. workers in a different "occupation" than the H-2A workers, even though the H-2A workers might occasionally perform the same work as those less-skilled U.S. workers. The 2010 regulation changed course and defined "corresponding employment" as "[t]he employment of workers who are not H-2A workers . . . in any work included in the job order, or in any agricultural work performed by the H-2A workers." 20 C.F.R. § 655.103(b). Thus, the 2010 rule requires employers to pay the adverse effect wage rate to any and all U.S. workers who perform any work that is the same as any skilled or agricultural work that is performed by H-2A workers.

Overdevest is a large plant nursery and producer of plant material based in southern New Jersey and has participated in the H-2A program since 1999. Overdevest grows and sells over 2,000 varieties of plants, and it employs both unskilled and skilled workers. Overdevest employs less-skilled U.S. workers who serve as production workers. Overdevest also employs H-2A workers as order pullers, who "hold the paper, the clipboard, and essentially see to it that the correct plants, correct quantity [of plants], correct quality [of plants] . . . are pulled by the crew." A171. In 2012 and 2013, Overdevest again received certification to hire H-2A workers to serve as order pullers. In the work order forms, Overdevest certified that it expected the H-2A workers to "accurately and timely pull orders," "[g]enerate occasional written reports," and "[p]erform[] other general nursery tasks as necessary." A123. Overdevest paid the H-2A workers the adverse effect wage rate, but production workers received a lower hourly wage.

In 2013, the Department investigated Overdevest to determine whether it was complying with the H-2A program.

Overdevest's H-2A workers were sometimes performing general production work, but Overdevest was paying the U.S. production workers performing the same work a lower hourly wage than the H-2A workers. The Department concluded that Overdevest violated the H-2A regulations requiring employers to pay the adverse effect wage rate to any U.S. workers serving in corresponding employment. After an ALJ and the Department's Administrative Review Board found in favor of the Department, Overdevest filed suit in the District Court. Overdevest alleged that (1) the definition of "corresponding employment" was inconsistent with the INA and not entitled to *Chevron* deference, and (2) the Department misapplied the 2010 rule defining "corresponding employment" against Overdevest. After the parties filed cross-motions for summary judgment, the District Court denied Overdevest's motion and granted the Department's motion in whole. Overdevest timely appealed.

"We review the district court's grant of summary judgment *de novo*." *W. Surety Co. v. U.S. Eng'g Constr., LLC*, 955 F.3d 100, 104 (D.C. Cir. 2020). We "evaluat[e] the administrative record directly and invalidat[e] the Department's actions only if, based on that record, they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Stand Up for California! v. U.S. Dep't of Interior*, 879 F.3d 1177, 1181 (D.C. Cir. 2018) (internal quotation marks omitted); *see also* 5 U.S.C. § 706(2)(A).

## II.

We first turn to Overdevest's challenge to the Secretary's interpretation of 8 U.S.C. § 1188(a)(1) in the 2010 Rule. Overdevest argues that the Secretary was not entitled to *Chevron* deference because (1) Congress, in enacting section 1188(a)(1), was explicit that only qualified U.S. workers were

to receive the same wage as H-2A workers; and (2) the Secretary's interpretation was not reasonable.

Under the *Chevron* framework, we must first resolve whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43 (1984). In determining whether a statute is ambiguous, "the court begins with the text, and employs 'traditional tools of statutory construction' to determine whether Congress has spoken directly to the issue." *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1241 (D.C. Cir. 2020) (quoting *Prime Time Intern. Co. v. Vilsack*, 599 F.3d 678, 683 (D.C. Cir. 2010)). Should the text not answer the question, this Court will also consider the "structure, purpose, and legislative history to determine if the Congress has expressed its intent unambiguously." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 605 (D.C. Cir. 2016) (per curiam). If, after exhausting all of our tools of construction, we determine that "the statute is 'silent or ambiguous with respect to th[e] specific issue,' we assume 'Congress has empowered the agency to resolve the ambiguity,' and we defer to the agency's interpretation as long as it is reasonable." *Am. Hosp. Ass'n*, 964 F.3d at 1240 (quoting *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 315 (2014)).

Overdevest argues that Congress was unambiguous in enacting section 1188(a)(1). Recall that the text provides that an employer must certify that "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition." 8 U.S.C. § 1188(a)(1)(A). Because subsection A requires employers to certify that there are insufficient U.S. workers "who are able, willing, and qualified," Overdevest argues that subsection B's reference to

"similarly employed" workers (from which "corresponding employment" is derived) is necessarily limited to U.S. workers who are employed in the same position as H-2A workers. Overdevest also invokes the *ejusdem generis* and *noscitur a sociis* canons to argue that the words "able, willing, and qualified" limit the definition of "similarly employed." Finally, Overdevest contends that the purpose of the statute resolves any ambiguity, as the statute was meant only to protect qualified U.S. workers. Thus, Overdevest argues, Congress was unambiguous that subsection B only applies to qualified U.S. workers.

We disagree. Starting with the text, the different language used in subsections A and B suggests that Congress did not limit "similarly employed" to unambiguously mean "able, willing, and qualified." As the Supreme Court has made clear, "when Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—[the reviewing court] presumes that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) (cleaned up). Had Congress intended to unambiguously limit the reach of subsection B to "able, willing, and qualified" U.S. workers, it could have simply reused this language from subsection A in the very next provision. But Congress did not. Congress therefore left the decision of how to interpret subsection B to the Secretary.

Nor do the canons Overdevest invokes render subsection B unambiguous. Both the *ejusdem* and the *noscitur* canon apply when the term in question is directly preceded by a list of terms. *See Ejusdem Generis*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[W]hen a general word or phrase *follows a list of specifics*, the general word or phrase will be interpreted to include only items of the same class as those listed." (emphasis added)); *Noscitur a Sociis*, BLACK'S LAW

DICTIONARY (11th ed. 2019) ("A canon of construction holding that the meaning of an unclear word or phrase, *esp. one in a list*, should be determined by the words immediately surrounding it." (emphasis added)); *see also, e.g.*, *United States v. Espy*, 145 F.3d 1369, 1370–71 (D.C. Cir. 1998) ("Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category."); *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) ("The traditional canon of construction, *noscitur a sociis*, dictates that words grouped in a list should be given related meaning." (quoting *Massachusetts v. Morash*, 490 U.S. 107, 114–15 (1989) (internal quotation marks omitted))). Here, however, the term "similarly employed" does not immediately follow "able, willing, and qualified." The term is not even in the same provision. Therefore, these canons are irrelevant.

Finally, contrary to Overdevest's assertion, the purpose of section 1188(a)(1) confirms that the statute is not unambiguous in the way Overdevest claims it is. As we explained in *Mendoza*, in enacting Section 1188, "Congress was concerned about (1) the American workers who would otherwise perform the labor that might be given to foreign workers, and (2) American workers in similar employment whose wages and working conditions could be adversely affected by the employment of foreign laborers." *Mendoza*, 754 F.3d at 1017. The statute was thus not merely meant to protect qualified U.S. workers. The statute was also meant to protect all U.S. workers who would be hurt by an influx of foreign workers performing unskilled work. Therefore, contrary to Overdevest's claim, the purpose of section 1188(a)(1) does not support its narrow reading of the statute.

We next turn to whether the Secretary's interpretation of section 1188(a)(1) was reasonable under *Chevron* Step Two.

The regulation in question defines "corresponding employment" as:

> The employment of workers who are not H-2A workers by an employer who has an approved H-2A Application for Temporary Employment Certification in any work included in the job order, or in any agricultural work performed by the H-2A workers. To qualify as corresponding employment the work must be performed during the validity period of the job order, including any approved extension thereof.

20 C.F.R. § 655.103(b). Overdevest argues that this definition renders subsection A of section 1188(a)(1) purely retrospective, meaning that the employer only has to demonstrate that there are insufficient "qualified" U.S. workers available up until the time of certification, and subsection B prospective, thereby rendering the "qualified" requirement of subsection A a nullity once the Department has certified a U.S. employer under the H-2A program. This interpretation, Overdevest claims, is unreasonable for two reasons. First, Overdevest argues that this definition unreasonably expands the protections of subsection B to any U.S. worker performing the same work as H-2A workers. Overdevest claims that the regulation creates two classes of U.S. workers, where unqualified U.S. workers are placed at an advantage over qualified U.S. workers, which Overdevest contends runs contrary to the purpose of the statute. Second, Overdevest contends that the regulation is unreasonable because it runs contrary to both the statute and the Secretary's other regulations, which require employers to comply with subsection A and continue to hire qualified U.S. workers, if available, even after the employer has been certified to hire H-2A workers.

We agree with the Secretary that the regulation is reasonable. The regulation advances the statute's purpose by ensuring that when H-2A workers are performing duties that do not implicate their qualifications, non-H-2A workers will not be placed at a disadvantage. *See Mendoza*, 754 F.3d at 1017 ("The clear intent of [section 1188(a)(1)] is to protect American workers from the deleterious effects the employment of foreign labor might have on domestic wages and working conditions."). It does so by requiring employers to pay non-H-2A workers the same amount that they pay the H-2A workers when they are doing the same work. This is an eminently reasonable interpretation of subsection B's mandate that the Department protect "similarly employed" workers who are "adversely affected."

Nor does the bifurcation of subsections A and B read out the "qualified" requirement from subsection A. Other Department regulations require employers to hire qualified U.S. workers after employers have been certified to hire H-2A workers. *See* 20 C.F.R. § 655.135(d) (requiring employers to hire qualified U.S. workers until fifty percent of the time frame set out in the H-2A work order has elapsed). The Department's interpretation here does not remove or contradict this requirement. Instead, it specifically seeks to satisfy the mandate Congress set out for the Department in subsection B. We therefore hold that the Department's definition of "corresponding employment" was reasonable.

## III.

We also reject Overdevest's argument that the Department arbitrarily and capriciously promulgated the definition of corresponding employment. Overdevest argues that the Department failed to adequately explain its departure from its 2008 definition of "corresponding employment" when it amended the definition in 2010.

In reviewing an agency's rule, "we are 'not to substitute [our] judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 536 (D.C. Cir. 2020) (quoting *DHS v. Regents of the University of California*, ⸺ U.S. ⸺, 140 S. Ct. 1891, 1905 (2020)). "[A]n agency may change its policy position but must 'display awareness that it *is* changing position' and 'show that there are good reasons for the new policy.'" *Id.* at 539 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

The Department first defined "corresponding employment" in 1987. There, the Department defined workers engaged in corresponding employment as "workers hired . . . in the occupations and for the period of time set forth in the job order." 29 C.F.R. § 501.0 (1987). In 2008, the Department limited the regulation's reach to newly hired U.S. workers and provided an incidental-work exemption, which permitted H-2A workers to devote up to twenty percent of their time to perform duties incidental to agricultural work. *See* 73 Fed. Reg. 77,110, 77,230, 77,234 (Dec. 18, 2008).

Two years later, the Department reversed course. The new definition eliminated the changes made in the 2008 rule after the Department concluded that the "newly hired" provision "stripped . . . protections from longtime employees of H-2A employers." 75 Fed. Reg. 6,884, 6,886 (Feb. 12, 2010). The Department also eliminated the "minor work" exemption because it was "not . . . in keeping with the plain statutory language requiring the Department to find that there are not enough [domestic] workers available to perform the work for which H-2A workers are being sought." *Id.* at 6,889. With one exception, the Department described the 2010 change as a return to the 1987 definition: it added "the phrase [']or in any

agricultural work performed by the H-2A workers.[']" *Id.* at 6,885.

The Department satisfied its obligations under the APA when it amended the definition of "corresponding employment" in 2010. "An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox Television Stations*, 556 U.S. at 515. Here, the Department did not ignore the fact that it was changing the policy, and it provided "good reasons for the new policy." *Id.* The Department explained why it eliminated the amendments made in the 2008 rule. It stressed that the 2008 changes created an inconsistent regulatory framework, where longtime U.S. employees were placed at a disadvantage. Moreover, the Department noted that the minor-work exemption was "incongruous," as it allowed employers to claim a need for H-2A workers without defining the specific work they needed. 75 Fed. Reg. at 6,889. The Department also explicitly acknowledged its sole departure from the 1987 rule, explaining that the "language was added to address the adverse impact on U.S. workers when an H-2A employer engages H-2A workers in agricultural work outside the scope of work found in the approved job order." *Id.* at 6,885. These explanations were more than sufficient to satisfy the Department's burden under *Fox Television Stations*.

## IV.

Finally, we also conclude that the Secretary's enforcement of the 2010 rule against Overdevest was not arbitrary and capricious. Overdevest claims that the definition of "corresponding employment" forced Overdevest to choose between violating the "corresponding employment" rule or violating regulations barring H-2A workers from performing work outside the scope of the job order or the rules requiring

H-2A workers to work at least three-fourths of the workday for the total period. *See* 20 C.F.R. §§ 655.122(i); 655.182(d)(vii).

But as the Secretary notes, Overdevest had several methods at its disposal to avoid running afoul of any of the Department's regulations. Overdevest could have drafted narrower work orders and paid the H-2A workers for any idle hours needed to satisfy the three-fourths rule. *See* 20 C.F.R. § 655.122(i)(1)(iv) ("If during the total work contract period the employer affords the U.S. or H-2A worker less employment than that required . . . the employer must pay such worker the amount the worker would have earned . . . ."). Alternatively, Overdevest could have simply paid the domestic workers the same wage as H-2A workers whenever the H-2A workers were performing the same work. There was thus no inevitable conflict between the 2010 rule and other regulations, so the enforcement action against Overdevest was not arbitrary and capricious. *Cf. Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60–64 (1984).

## V.

Consistent with the foregoing, we affirm the District Court's grant of summary judgment to Appellees.

*So ordered.*