# United States Court of Appeals
## For the First Circuit

No. 22-1198

MAINE FOREST PRODUCTS COUNCIL, PEPIN LUMBER, INC., and STÉPHANE
AUDET,

Plaintiffs, Appellees,

v.

PATTY CORMIER, in her official capacity as Director of the Maine
Bureau of Forestry, and AARON FREY, in his official capacity as
Attorney General for the State of Maine,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Howard, Circuit Judges.

Jason D. Anton, Assistant Attorney General, with whom Aaron
M. Frey, Attorney General, Thomas A. Knowlton, Deputy Attorney
General, Chief, Litigation Division, and Sarah E. Coleman,
Assistant Attorney General, were on brief, for appellants.
Nolan L. Reichl, with whom Joshua D. Dunlap, Kellie MacDonald,
and Pierce Atwood LLP, were on brief, for appellees.

October 12, 2022

**SELYA**, **Circuit Judge**. This appeal requires us to consider whether federal law preempts a Maine law fashioned to prevent Canadian truck drivers from hauling logs within the state under the auspices of the federal H-2A visa program. Finding that the plaintiffs were likely to succeed in their challenge and that the equities counseled in their favor, the district court preliminarily enjoined enforcement of the law before it took effect. See Me. Forest Prods. Council v. Cormier, 2022 WL 504379 (D. Me. Feb. 18, 2022). Concluding, as we do, that the challenged law is likely preempted as an obstacle to the federal H-2A program, we affirm the district court's issuance of a preliminary injunction.

**I**

The logging industry is a fixture of northern Maine. In June of 2021, the Maine legislature enacted Public Law 280, titled "An Act Regarding the Transportation of Products in the Forest Products Industry" (P.L. 280). The relevant portions of the law, codified at Me. Stat. tit. 12, § 8006, prohibit motor carriers and landowners owning at least 50,000 acres of Maine forest land from hiring anyone who is not a "resident of the United States" to drive a vehicle "transport[ing] forest products" from one place to another within Maine. Id. The law imposes an escalating series of fines for violations, reaching as high as $25,000 per violation

for a landowner and $10,000 per violation for a motor carrier. See id.

The sparse legislative history of P.L. 280 indicates that the Maine legislature's primary concern was the federal government's issuance of H-2A visas to Canadian truck drivers, who would then secure employment moving Maine logs. Consistent with this emphasis, P.L. 280 states that a "'[r]esident of the United States' does not include a person eligible to be in the United States under the United States H-2A visa program." Id. § 8006(1)(E). Broadly speaking, the H-2A visa program (which we shall discuss in more detail below) authorizes foreign agricultural workers to perform seasonal work in this country when qualified U.S. workers cannot be found to fill available jobs.[1] See 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188; Overdevest Nurseries, L.P. v. Walsh, 2 F.4th 977, 980 (D.C. Cir. 2021).

The parties direct our attention to testimony presented to the legislature's Joint Standing Committee on Taxation by one of the law's principal sponsors, Senator Troy Jackson. Senator Jackson asserted that "Maine loggers and truckers face an uphill battle competing against their counterparts in Canada, who benefit from a favorable exchange rate and government-sponsored health insurance." This competition, he continued, is facilitated by the

_____

[1] For purposes relevant to H-2A visas, agricultural labor includes logging employment. See 29 C.F.R. § 501.3(b).

- 3 -

federal government's practice of issuing H-2A visas to Canadian truck drivers who transport logs within Maine — a practice that Senator Jackson claimed "has depressed wages for Maine people working in the woods and handed large landowners extraordinary power in the industry." According to Senator Jackson, granting H-2A visas to Canadian truck drivers to transport Maine logs within the state is a "misuse of the H-2A program" and causes "injustice to Maine workers."[2]

On October 7, 2021 — just a few days before P.L. 280 was to take effect — this action was brought. Maine Forest Products Council (a logging industry trade association), Pepin Lumber, Inc. (a Maine logging company), and Stéphane Audet (a Canadian truck driver working for Pepin Lumber under an H-2A visa) jointly filed suit in the United States District Court for the District of Maine against the Director of the Maine Bureau of Forestry and the

---

[2] Senator Jackson added that his prior experience in the logging industry led him to believe that federal law already prohibits Canadian truck drivers from transporting goods point-to-point within the United States, a practice known as "cabotage." See 8 C.F.R. § 214.2(b)(4)(i)(E) (restricting point-to-point transportation of goods by aliens entering the country under B-1 business visas pursuant to the United States-Mexico-Canada Agreement); Robert v. Reno, 25 F. App'x 378, 382 (6th Cir. 2002) (discussing cabotage rules); see also 19 C.F.R. § 123.14(c). In light of the federal prohibition on cabotage for those possessing B-1 visas, Senator Jackson mused, "there is real confusion as to why the federal government would allow this practice under the H-2A visa program." But even though the cabotage issue was apparently a significant part of Senator Jackson's motivation, it is of minimal relevance to this appeal. Consequently, we do not dwell on it.

Attorney General of Maine (together, the State).  Their complaint, which sought injunctive and declaratory relief, alleged that P.L. 280 is preempted under the Supremacy Clause of the United States Constitution and violates the Equal Protection Clauses of both the United States and Maine Constitutions.

The same day, the plaintiffs (whom we shall sometimes refer to collectively as "the Loggers") moved for a temporary restraining order (TRO) and a preliminary injunction against the enforcement of P.L. 280.  During a conference with counsel that day, the TRO motion was dismissed following the State's agreement that it would not enforce P.L. 280 until further order of the district court.  See Me. Forest Prods. Council, 2022 WL 504379, at *1.  The parties — agreeing on the relevant facts — subsequently briefed the preliminary injunction motion.  See id. at *1 n.1.  On February 18, 2022, the district court preliminarily enjoined the enforcement of P.L. 280 in its entirety on two independent grounds: preemption and equal protection.  See id. at *31-32.

This timely appeal ensued.  In it, the State challenges only the substance of the preliminary injunction, not its breadth or scope.  We limit our review accordingly.

## II

We begin with a cautionary note:  "[a] preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  To

- 5 -

obtain this remedy, the moving parties must show that the balance of four factors tips in their favor: a "likelihood of success on the merits; whether and to what extent the movant[s] will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships . . . ; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020).

We review a district court's grant of a preliminary injunction for abuse of discretion. See We the People PAC v. Bellows, 40 F.4th 1, 9 (1st Cir. 2022). Under this multifaceted standard, "we review the district court's answers to legal questions de novo, factual findings for clear error, and judgment calls with some deference to the district court's exercise of its discretion." Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020).

On appeal, the State has challenged only the district court's determination that the Loggers have shown a likelihood of success on the merits. We have made it pellucid that this is the factor that "weighs most heavily in the preliminary injunction calculus." Ryan, 974 F.3d at 18. It is, moreover, the "sine qua non" for preliminary injunctive relief. Id. (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).

The district court found that the other three factors were compatible with the issuance of a preliminary injunction. See Me. Forest Prods. Council, 2022 WL 504379, at *29-31. On appeal, the State has not advanced any arguments relevant to those factors, and we deem any such argument waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

The upshot is that, for present purposes, the preliminary injunction rises or falls on the plaintiffs' likelihood of success on the merits of their claims. It is to that singular issue that we now turn. And although the district court found that the Loggers' challenge to P.L. 280 was doubly likely to succeed — on the separate grounds of preemption and equal protection — it is unnecessary for us to address both aspects of the district court's decision.[3] See Toll v. Moreno, 458 U.S. 1, 9-10 (1982) (affirming lower court's preemption holding and declining to address alternative equal protection holding). We conclude that P.L. 280 is likely preempted and — with that conclusion as the linchpin — we hold that the plaintiffs have

---

[3] We read the district court's opinion as concluding that a preliminary injunction was warranted on the preemption theory alone. See Me. Forest Prods. Council, 2022 WL 504379, at *19 & n.23. The court also chose to address the equal protection theory, chiefly because the existence of irreparable harm is "clearer" on that ground and avoiding the equal protection analysis would "run[] the risk" that this court would be required to remand. Id. at *19 n.23.

carried their burden of showing a likelihood of success on the merits.

**A**

Our system of overlapping federal and state sovereignties gives rise to "the possibility that laws can be in conflict or at cross-purposes." Arizona v. United States, 567 U.S. 387, 399 (2012). The constitutional rule in such cases, embodied in the Supremacy Clause, makes federal law "the supreme Law of the Land," which overwhelms "any Thing in the Constitution or Laws of any State to the Contrary." U.S. Const. art. VI, cl. 2. Congress thus "has the power to pre-empt state law." Arizona, 567 U.S. at 399.

Preemption has three branches:  "express," "field," and "conflict." Id.; see Consumer Data Indus. Ass'n v. Frey, 26 F.4th 1, 5 (1st Cir. 2022). In this instance, the parties have focused their arguments solely on conflict preemption — specifically, the offshoot of conflict preemption called "obstacle preemption." We follow their lead.

Obstacle preemption is implicated when "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Arizona, 567 U.S. at 399 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)). Cases of obstacle preemption (like all forms of preemption) fit into the following mold:  "Congress enacts a law

that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." Murphy v. Nat'l Collegiate Athletic Ass'n, 138 S. Ct. 1461, 1480 (2018). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000).

"In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (alteration in original) (citation omitted) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). The presumption does not apply, though, "when the State regulates in an area where there has been a history of significant federal presence." United States v. Locke, 529 U.S. 89, 108 (2000); see Brown v. United Airlines, Inc., 720 F.3d 60, 68 (1st Cir. 2013). And whether or not the presumption against preemption applies, the burden of proving preemption lies with the parties asserting it (here, the

plaintiffs).  See Capron v. Off. Of Att'y Gen. of Mass., 944 F.3d 9, 21 (1st Cir. 2019).

The Loggers argue that the presumption is inapplicable here because P.L. 280 seeks to regulate immigration — an area traditionally of federal concern.  This argument is not without some force, but — for ease in exposition — we assume (albeit without deciding) that the presumption against preemption applies in this case.

**B**

Having sketched the analytical framework governing the Loggers' claim of obstacle preemption, we proceed to describe the H-2A program with which P.L. 280 is alleged to conflict.  Under the Immigration and Nationality Act of 1952 (INA), as amended, an "H-2A worker" is "an alien . . . having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services . . . of a temporary or seasonal nature."  8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188(i)(2).  An H-2A petition must be filed with federal immigration authorities by the worker's prospective employer.  See id. § 1184(c)(1); 8 C.F.R. § 214.2(h)(5).  Approval of an H-2A petition is contingent upon the certification of the Secretary of Labor that:

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to

perform the labor or services involved in the petition, and

(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1).

Congress has authorized the Secretary of Labor to promulgate regulations implementing the H-2A program. See 8 U.S.C. § 1188; see also 8 U.S.C. § 1101(a)(15)(H)(ii). Pursuant to this authority, the Secretary has issued comprehensive regulations governing the H-2A certification process. As relevant here, the key components of that process are as follows. The employer must submit an "Application for Temporary Employment Certification" to the Secretary of Labor. 20 C.F.R. § 655.130. Between sixty and seventy-five days before work is needed, the prospective employer must also submit a "job order" meeting specified criteria to the local State Workforce Agency (SWA), which will advertise compliant job orders through the intrastate and interstate "clearance" systems in an effort to find qualified U.S. workers. Id. § 655.121(a)-(c). The employer must accept all referrals of eligible U.S. workers by the SWA and independently recruit U.S. workers for the job. See id. §§ 655.135, 655.153; see also 8 U.S.C. § 1188(b)(4). If the employer rejects qualified referrals or other U.S. applicants without a legitimate reason, they will be counted as "available" workers, and their presence may prevent the

issuance of the necessary certification that "there are insufficient U.S. workers to fill the employer's job opportunity." 20 C.F.R. § 655.161(b).

The regulations also ensure that the open agricultural jobs can be filled by qualified U.S. workers without depressing their wages or working conditions. For example, "[e]mployers seeking H-2A certification are required to pay the higher of the Adverse Effect Wage Rate (AEWR), the prevailing wage, or the legal minimum wage." Mendoza v. Perez, 754 F.3d 1002, 1008 (D.C. Cir. 2014) (citing 20 C.F.R. § 655.120(a)). "The AEWR is a specially calculated wage based on the Department of Agriculture's Farm Labor Survey, which approximates what the prevailing wage would be if not for the hiring of foreign workers." Id. (citing Temporary Agricultural Employment of H-2A Aliens in the United States, 75 Fed. Reg. 6884, 6891-93 (Feb. 12, 2010)). This rate, in effect, "provides a wage floor that aims to prohibit employers from underpaying foreign workers and thereby depressing wages for similarly-employed American workers." Overdevest Nurseries, 2 F.4th at 981. Moreover, the employer "must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers" — all of which must satisfy certain minimum standards specified by regulation. 20 C.F.R. § 655.122.

If the Secretary of Labor provides the certification and the petition is approved by the immigration authorities, the H-2A worker "may be employed only by the [employer] through whom the status was obtained." 8 C.F.R. § 274a.12(b)(9). An H-2A visa will be revoked if the worker "is no longer employed by the petitioner in the capacity specified in the petition." Id. § 214.2(h)(11)(iii)(A)(1).

## C

This tees up the question of whether P.L. 280 is an obstacle to the achievement of Congress's purposes in enacting the H-2A worker visa program and, therefore, preempted.

## 1

As classically formulated, the doctrine of obstacle preemption invites courts to assess a federal statute's "full purposes and objectives" in deciding whether the state law "stands as an obstacle" to their achievement. Hines, 312 U.S. at 67. In Arizona, for example, the Supreme Court held that a state law making it a crime for an unauthorized alien to apply for or perform work in the state was "an obstacle to the regulatory system Congress chose." 567 U.S. at 406. After examining "the text, structure, and history" of the relevant statute, the Court concluded that "Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment." Id. The state law criminalizing that

conduct was therefore preempted under the doctrine of obstacle preemption.  See id. at 407.

Recently, though, several Justices have questioned the wisdom and legitimacy of grounding preemption upon judicial "[e]fforts to ascribe unenacted purposes and objectives to a federal statute."  Va. Uranium, Inc. v. Warren, 139 S. Ct. 1894, 1907 (2019) (lead opinion of Gorsuch, J.).  Such purposes are difficult to discern, these Justices argue, and finding preemption due to "hidden legislative wishes" risks "displacing the legislative compromises actually reflected in the statutory text" — thereby "displacing perfectly legitimate state laws on the strength of 'purposes' that only we can see, that may seem perfectly logical to us, but that lack the democratic provenance the Constitution demands before a federal law may be declared supreme."  Id. at 1907-08.

Perhaps harboring concerns of this nature, the Court's recent cases have subtly reframed the obstacle preemption analysis as limited to cases in which "Congress enacts a law that imposes restrictions or confers rights on private actors" and "a state law confers rights or imposes restrictions that conflict with the federal law."  Murphy, 138 S. Ct. at 1480.  In that vein, the Court glossed Arizona's holding, reasoning that the federal statute at issue there "implicitly conferred a right to be free of criminal (as opposed to civil) penalties for working illegally, and thus a

state law making it a crime to engage in that conduct conflicted with this federal right."  Kansas v. Garcia, 140 S. Ct. 791, 806 (2020).

Mindful of this subtle shift, we frame the question before us as follows:  have the Loggers shown that they are likely to succeed in their claim that the federally enacted H-2A program confers a right on private actors (either explicitly or implicitly) that conflicts with P.L. 280's restrictions?  As we shall explain below, we think that such a conflict is unmistakable and that, therefore, the Loggers have made the requisite showing.

**2**

The text and structure of the H-2A statutory provisions reflect Congress's considered judgment that agricultural employers who cannot find qualified U.S. workers should be able to hire foreign laborers when specified criteria are satisfied.  The system is responsive to the employer's immediate labor needs.  For instance, the employer's application deadline cannot be "more than 45 days before the first date the employer requires the labor or services of the H-2A worker," and the employer must be notified of any deficiencies in the application and be given a chance to resubmit.  8 U.S.C. § 1188(c).  Tellingly, the statute directs the Secretary of Labor to issue the requisite certification so long as "the employer has complied with the criteria for certification" (both statutory and regulatory), and to do so "not later than 30

days before the date such labor or services are first required to be performed." Id. § 1188(c)(3)(A). Although Congress left the ultimate decision about whether to grant a given petition in the Attorney General's discretion, the Attorney General must first consult with the Department of Labor and the Department of Agriculture. See id. § 1184(c)(1).

To be sure, an employer seeking to hire an H-2A worker must jump through hoops. This is because "Congress was concerned about (1) the American workers who would otherwise perform the labor that might be given to foreign workers, and (2) American workers in similar employment whose wages and working conditions could be adversely affected by the employment of foreign laborers." Mendoza, 754 F.3d at 1017. Even so, Congress deliberately crafted the H-2A program as a last resort for employers who have demonstrated a specific, unfilled need for temporary agricultural labor that U.S. workers will not do (and when U.S. workers will be no worse off if foreign workers do it instead). Congress evidently decided that when an employer has run this gauntlet and made the required showing to federal authorities, the employer should have access to foreign labor rather than see its business prospects wither on the vine. We think it follows that Congress conferred a right, at least implicitly, on agricultural employers to hire temporary foreign workers when the H-2A criteria are satisfied.

The history of the H-2A program confirms this understanding. As originally enacted, the INA recognized a general H-2 category of nonimmigrant aliens "coming temporarily to the United States to perform other temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country." INA, Pub. L. No. 82-414, § 101(a)(15)(H)(ii), 66 Stat. 163, 168. In this respect, the statute did not differentiate agricultural workers from other workers, and it contained no requirement for certification by the Secretary of Labor.[4]

All of this changed with the enactment of the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3359. "Congress enacted [the] IRCA as a comprehensive framework for 'combating the employment of illegal aliens.'" Arizona, 567 U.S. at 404 (quoting Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 147 (2002)). Amending the INA, section 301 of the IRCA established the H-2A agricultural worker program that we already have described. See 100 Stat. at 3411-17. According to the Senate Report, the purpose of the new H-2A category was "to assist agricultural employers in adjusting to the reduced availability of illegal foreign workers" in light of the IRCA's

---

[4] As a corollary, it should be noted that federal law at the time did not generally forbid the employment of aliens unlawfully present in the country. See Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 892-93 (1984).

- 17 -

greater restrictions. S. Rep. No. 99-132, at 2 (1985); cf. Changes to Requirements Affecting H-2A Nonimmigrants, 73 Fed. Reg. 76891, 76891 (Dec. 18, 2008) (describing purpose of H-2A regulations "to provide agricultural employers with an orderly and timely flow of legal workers, thereby decreasing their reliance on unauthorized workers, while protecting the rights of laborers"). The H-2A program was thus conceived as a means of addressing the unmet seasonal labor needs of agricultural employers by conferring a right to hire foreign laborers under specified conditions.

Having given shape to this implicit federal right, the conflict with P.L. 280 becomes starkly apparent. P.L. 280 is a blunt intrusion on the implicit federal right. Not by accident, it constitutes a direct and significant obstacle to achieving the H-2A program's clear and manifest objectives. The state law purports to forbid the employment of some of the very same laborers whom federal law authorizes to work after an exacting showing of need by their employers, in compliance with elaborate statutory and regulatory criteria.

It is difficult to envision a more perfect collision of purposes. P.L. 280 would nullify the implicit federal right of the employer to hire foreign laborers on a temporary basis when — through a process established by federal law — federal officials have specifically determined that U.S. workers are unavailable for the job and unaffected by the competition. The state law thus

rudely "interfere[s] with the careful balance struck by Congress." Arizona, 567 U.S. at 406.

The State contends that federal law does not preempt P.L. 280 because the H-2A program incorporates state employment law such that the two work in concert. In support, the State cites a regulatory provision requiring the SWA to ensure that each job order in the clearance system includes an assurance by the employer that "[t]he working conditions comply with applicable Federal and State minimum wage, child labor, social security, health and safety, farm labor contractor registration and other employment-related laws." 20 C.F.R. § 653.501(c)(3)(iii). P.L. 280's ban on H-2A truckers, the State contends, is merely one iteration of the "other employment-related laws" with which a job order must comply to qualify for the H-2A program. Based on this interpretation of the regulation, the State argues (in essence) that P.L. 280 is itself part of the federal scheme and can therefore prevent the issuance of H-2A visas for intrastate log-hauling jobs without being preempted by federal law.

Yet, that interpretation is belied by the text of the regulation, which — at the outset — specifies that it is the "working conditions" of the job that must comply with relevant law. The regulation, then, does not encompass every law about employment (as the State would have us read it) but, rather, encompasses a more circumscribed universe of "employment-related

- 19 -

laws" that pertain to working conditions. That obvious conclusion is bolstered by the ejusdem generis canon, which instructs that where "a more general term follows more specific terms in a list, the general term is usually understood to embrace any object similar in nature to those objects enumerated by the preceding specific words." Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1625 (2018) (internal quotation omitted). That is precisely the situation here: the specific types of laws listed in 20 C.F.R. § 653.501(c)(3)(iii) are laws relating to working conditions — and P.L. 280 is not similar in nature to those laws. Thus, P.L. 280 is too much of an interloper to find a home within the generalized regulatory phrase "other employment-related laws." To conclude that the law fits into the list would take a leap of faith equivalent to concluding that an elephant fits into an aviary.

What is more, we would not lightly adopt a reading of this regulation that would require federal officials to deny H-2A visas because of a state law specifically targeting the H-2A program. Such a reading would be in tension with the structure and purpose of the H-2A statutory provisions and would effectively give states a veto power over the federal program. The structure and purpose of the program argue persuasively against the existence of such a veto power. See 20 C.F.R. § 655.121(b)(2) (providing employers with process to bypass SWA and petition Department of Labor directly if SWA does not approve job order).

The State's final refrain is that P.L. 280's "goal of protecting Maine's domestic labor market" does not conflict with federal law but, rather, is "complementary" to the H-2A program's manifest concern with potential adverse effects on U.S. workers due to imported foreign laborers. The State claims that "Maine's Legislature enacted the law based on its determination that there are sufficient local, domestic workers to fill these positions and that employment by non-domestic workers has an adverse impact on Maine wages and the Maine economy."[5]

This claim will not wash. Even a state law that "attempts to achieve one of the same goals as federal law" may be preempted when "it involves a conflict in the method" of execution. Arizona, 567 U.S. at 406; see Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge, 403 U.S. 274, 287 (1971) ("Conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy."). P.L. 280's methods of protecting domestic workers are, in many important respects, at odds with the federal program's methods.

The H-2A process determines the availability of U.S. workers on a case-by-case basis and by floating a job order on the

---

[5] The State also points to an out-of-circuit case as support for its position, LeClerc v. Webb, 419 F.3d 405 (5th Cir. 2005). But that case is readily distinguishable, as its preemption analysis relies on the structure and purpose of a different visa scheme: the H-1B program.

market; it addresses adverse impacts on U.S. workers by setting minimum wage rates and working conditions; it lodges decisionmaking authority with the Secretary of Labor and the Attorney General; and it responds to employers' labor needs by allowing the hiring of foreign workers as a last resort. P.L. 280 does none of these things, yet it attempts to override the specific H-2A work authorizations provided by federal law. The Supremacy Clause stands in its way.

## III

We need go no further. Preliminary injunctions are strong medicine and should be dispensed with care. Here, however, the Loggers have carried their burden of showing (even assuming arguendo the applicability of the presumption against preemption) that the H-2A restriction imposed by P.L. 280 is likely preempted by federal law. Given this showing and given the district court's unchallenged determination that the other elements of the preliminary injunction calculus are consistent with the granting of relief, the district court's issuance of a preliminary injunction must be

**Affirmed**.