# United States Court of Appeals
## For the First Circuit

No. 22-1284

XIOMARA SANTIAGO,

Plaintiff, Appellant,

v.

MUNICIPALITY OF UTUADO,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Montecalvo, Lipez, and Thompson,
Circuit Judges.

Kenneth Colón, with whom Juan M. Frontera-Suau and Frontera Suau Law Offices, PSC were on brief, for appellant.

Eliezer A. Aldarondo-López, with whom Aldarondo & López-Bras, LLC was on brief, for appellee.

August 22, 2024

THOMPSON, **Circuit Judge**. The Puerto Rico Municipality of Utuado hired Xiomara Santiago to be the Deputy Director for the local Head Start/Early Head Start Program (hereinafter "Head Start" or "the Program"). Not long after her hire, a mayoral election changed the town's administration and the new chief exec terminated Santiago's employment. Claiming her dismissal violated her Fourteenth Amendment due process rights and was the result of political discrimination in violation of her First Amendment rights, Santiago sued the Municipality and sought a preliminary injunction to get her job back. After the district court held a series of hearings on Santiago's motion -- four days of testimony between May 17 and July 2, 2021 from three witnesses -- it ultimately denied her request, concluding she had not shown a likelihood of success on the merits of either claim.[1] Santiago now appeals the district court's decision, contending its conclusion was an abuse of discretion. For the reasons set forth herein, we affirm.

## Background

With the basic scene in place, we now turn to the record details that are relevant to the claims and arguments at issue on appeal, pulling out facts from the testimonies provided by

---

[1] A magistrate judge presided over the hearings and issued a Report & Recommendation which the district judge ultimately adopted in its entirety over Santiago's objection.

Santiago, the new mayor of Utuado, and Head Start's Human Resources Director, and also from the documents received into evidence during the hearings. We present the details in chronological order to best summarize the sequence of events leading up to Santiago's termination and this litigation which followed. Our chronological approach means we shift perspectives between witnesses and documentary evidence a few times. Where certain details aren't needed to paint the backdrop prior to delving into the merits of Santiago's claims, we hold those parts of the backstory until our discussion of the relevant argument when the additional context will be helpful. We kick things off with some information about Santiago herself and her start as Head Start's Deputy Director.

Plaintiff Xiomara Santiago holds a bachelor's degree in Pre-School Education but worked as the Director of Landscaping and Recycling for the Municipality of Utuado for five years from 2013 until 2018. She next transitioned into the early education field teaching pre-school for a private company called Urban Strategies in the Municipality of Ponce. Following her teaching stint, in March 2020 Santiago successfully applied for the position of Deputy Director at Head Start for the Municipality of Utuado.

The posting for that position included the following minimum requirements and application details: (1) a bachelor's degree in Business Administration or Education; (2) three years of Head Start experience; (3) one year in a similar management

position; and (4) English language proficiency (including speaking, reading, and writing). To apply, the posting instructed candidates to submit a college credit transcript, a diploma, a certificate of Good Conduct and/or Criminal Record, and a document certifying compliance with filing tax returns for the prior four years. The posting also clearly stated that "[t]he candidate must meet the minimum requirements before the closing date and provide evidence of [all] documents stipulated in the vacancy announcement[]" and that "incomplete applications . . . or applications submitted after the closing date" would not be considered.

Blas Rosado, head of Human Resources at Head Start, received Santiago's application and forwarded the materials to the Program's Parents Committee (officially known as the Guideline Policy Council -- a body comprised of two parents from each Head Start center within the region who are elected by the parents of children enrolled in the Program). A subcommittee evaluated all of the applications and decided whether each candidate met the requirements from the posted job description. At the preliminary injunction hearing, Rosado testified that Santiago's application was complete and that she "fulfill[ed] the required academic preparation and experience," noting her six years of management experience "directing and supervising personnel" as well as her experience as a Head Start teacher when she worked at Urban

- 4 -

Strategies. Rosado also testified that the Parents Committee had agreed she met all the requirements for the position, interviewed two candidates, and chosen Santiago to advance to the then-mayor for his okay.

When the Municipality hired Santiago in August 2020 to be Head Start's Deputy Director, the mayor was Ernesto Irizarry Salvá, a member of the Popular Democratic Party ("PDP"). Santiago's first months on the job coincided with Utuado's municipal elections. She demonstrated her interest in the election process by working as (what she called) a "coordinator for a school for the [PDP]." In this municipal election cycle, Santiago's lifelong friend Jorge Pérez Heredia, a member of the New Progressive Party ("NPP"), ran against Irizarry. One day before the mid-August primary elections, Santiago received a campaign text message from Pérez -- a text message pushed out to all the contacts in his phone. The text included a photo of a sample ballot with his name checked and a message stating, "I will count on you tomorrow." Santiago says she ignored this message.

In late October, Pérez sent a text message just to Santiago which said: "Greetings friend, I only ask you to do things right, friend." Pérez explained at the preliminary injunction hearing that he sent the message after trying unsuccessfully to reach Santiago by phone. When Santiago received the text, she called Pérez, who, according to Pérez, told her he

had filed a complaint with the Puerto Rico Police against Rosado (the Head Start Human Resources director and a leader of the PDP with Mayor Irizarry), alleging Rosado had engaged in election fraud by impersonating a NPP official to get mail-in ballots. Pérez said he did not want to file a complaint against her as well. According to Pérez, he implored her to "do things right so she wouldn't get mixed up in those messes," seemingly implying that he thought she too had engaged in similar election irregularities. According to Pérez, he was "warning her because she was [his] friend and [he] didn't want her to be affected." He "wanted her to do the correct thing and not do the same thing." Santiago, for her part, testified Pérez "told [her] that there was a list containing [her] name; that [she] was going to be investigated by the feds for electoral fraud." Santiago testified that Pérez was very upset; the tone of his voice hostile as he told her that he had the list of people being investigated and she was on it. She felt threatened by the call even though she knew the fraud accusation was false. After that call, she continued her political work with the PDP. When the November 3, 2020 election day rolled around, Pérez defeated Irizarry to become Utuado's new mayor. Santiago says she never heard anything else about a fraud investigation after that, and she continued with her Head Start work.

Between election day and January 11, 2021 (when Pérez got sworn in as mayor), Mayor Irizarry, as allowed by Puerto Rico law, sought and received permission from the Director of Human Resources for the Government of Puerto Rico to renew employment contracts for over 200 Head Start employees whose transitory services contracts were set to expire on December 30.[2]

A quick aside to explain Head Start's governance structure will be useful to an understanding of Santiago's eventual employment termination. As described during the hearing, Head Start programs are operated through grants given by the federal government to a "regulatory concessionaire" or grantee, such as the Municipality of Utuado. Utuado is the concessionaire for Head Start in the Municipalities of Utuado, Jayuya, and Adjuntas. Utuado's management of the Program is "highly regulated" by the federal government, with the Program's operations overseen by a

---

[2] The timing for these contract renewals fell within the period blacked out by the Puerto Rico Municipal Code for employment appointments, promotions, transfers, demerits, re-classifications, and salary changes. By law, this period starts two months prior to the general election date and ends on the second Monday of the January following the election. See Rodriguez-Marin v. Rivera-Gonzalez, 438 F.3d 72, 75 (1st Cir. 2006) ("In an effort to combat political discrimination, Puerto Rico has an Electoral Moratorium that prohibits certain 'appointments, promotions, demotions, transfers and changes in the category of the employees' for the two months before and after a general election." (quoting P.R. Laws Ann. tit. 3, § 1337)). Exemptions exist for programs like Head Start that operate on a January 1 - December 31 fiscal year and where the employees' contracts need to be renewed so the services can continue to be provided to the community.

regional managing office in New York.  Locally, the Program is governed by a Board of Directors (or Governing Board, as the witnesses who testified sometimes called it), a five-person body headed up by the Mayor of Utuado and populated with four other members, all of whom are to be current municipal legislators.  The Governing Board is responsible for formal appointments and personnel changes to the top layers of the Program's administrations (such as the Director, Deputy Director, Fiscal Specialist, and Program Specialist) and the Parents Committee managed the administrative and programmatic parts of the Program (while being kept in the loop when the Governing Board made changes to the top Head Start leaders).

The federal grant funds for the Program are budgeted from January 1 through December 31 of each year.  Santiago's employment -- as well as that of all her colleagues -- was subject to renewal each year because the regional office approved the Head Start budget for one-year periods only.  Santiago's 2021 employment contract (which Irizarry had renewed prior to his departure) included several terms and conditions for her re-appointment to the Deputy Director position.[3]  As relevant to this case, one condition of employment was that she met the minimum requirements

_____

[3] The record does not include Santiago's initial employment contract which, presumably, covered the period from her start date in August 2020 through December 31, 2020.

of the position. An attachment to the contract spelled out the Deputy Director's duties and responsibilities which, among other things, included: assisting the Director to plan, direct, coordinate, supervise, and evaluate the Program's work and performance; conducting staff orientation meetings; preparing reports; helping to draft the annual budget; making presentations to parents, staff, the governing body, and community groups; and maintaining relationships with schools, agencies, and community partners. The renewal contract also listed circumstances under which the Municipality could terminate her employment, including if she received "a deficient performance evaluation . . . during the term of the contract," was "unable to perform the tasks for which she was hired," budget changes, restructuring or reorganization of the "offices, centers and/or areas," or "any other extraordinary situation warranting the termination of th[e] [c]ontract."

Turning again to Pérez. He took his oath of office on January 11, 2021, and his first month proved somewhat chaotic on the Head Start front after he learned that the Municipality's program was in trouble with the managing office in New York. The Program's problems included drastically lower student enrollment -- post Hurricane Maria 356 children enrolled versus the 740 children that the program had represented to the managing office. Also problematic and not reported to the New York office was the

closure of several locations for repairs though staff members in those shuttered facilities were retained on the payroll. The new mayor also discovered the Program's noncompliance with the grants' reporting requirements, including financial management of the grants, all of which sent Pérez scrambling to find and provide documentation which ultimately saved $5,000,000 in funding from one grant but resulted in the loss of $12,000,000 from another grant. During this time, Pérez wrote a letter to the Director of Head Start, Christian Quiñones-Figueroa, about the problems he had unearthed. Quiñones-Figueroa quickly responded, first, briefly addressing the content of the mayor's letter, then announcing that he would be on sick leave "for several days" after experiencing a medical emergency, and finally, indicating Santiago would serve as Acting Director until his return.[4] A few days after this exchange, Mayor Pérez circulated a memo to the Head Start "supervisors" and "coordinators" announcing Santiago would be serving as Acting Director until Quiñones-Figueroa could return to work.

In addition to appointing Santiago to Acting Director (whose authority, at least on paper, expanded to signing all

---

[4] Pérez's letter to Quiñones-Figueroa is not a part of the record but Quiñones-Figueroa's response to Mayor Pérez provides sufficient textual cues for the court to infer that Quiñones-Figueroa's response was, in part, a reaction to the Mayor's letter in which the Mayor had directed Quiñones-Figueroa to cease all repair projects to Head Start facilities and required all staff to return to working in person.

documents, including purchase orders, requisitions, and human resources-related documents) Pérez decided to bring in Manual Mena, a close friend he'd known for 30 years to whom he refers as his "second father," as a volunteer with "experience and knowledge"[5] to serve as Pérez's "aide" as Pérez navigated the issues between Head Start and the managing office in New York. In a letter to Mena with a cc to the New York office, Pérez wrote that he was assigning Mena as "In-Charge for the [Head Start] and [Early Head Start] Program[s] for the Municipality of Utuado, effective immediately as to provide continuity for Program processes and compliance with Federal Regu[l]ations." According to Santiago, she did not benefit from Mena's presence. As she tells it, during Mena's first weeks at the Program, he met with her co-workers several times without inviting her, which made her feel "pushed aside" and like she did not "have a voice or a vote at work. . . . They took away all my [work] functions. . . . [I]n fact, they put a deputy, an interim deputy director, and interim director above me."

One day in late January or early February (none of the witnesses could remember the precise date), Pérez held a three-hour meeting with a dozen or so Head Start managers and coordinators from various departments to figure out how to resolve

---

[5] The record does not, however, explain what experience or knowledge Mena brought to the table.

the financial reporting issues with the managing office before the February 28 deadline the New York office had imposed. Throughout the meeting, Pérez asked Santiago many general questions about the status of approximately twenty projects, as well as about proposals and budgets, but she was unable to answer any of the questions. That was so, Santiago says, because Quiñones-Figueroa "was out on sick leave and those questions that I could not answer because at the time I did not have the information." During this meeting Pérez also learned that Santiago did not have access to the three electronic databases with information and data about the projects about which he was inquiring, and Santiago could not tell him why Quiñones-Figueroa had allowed some staff to work from home and collect their pay while other staff members were not allowed to work remotely. Nor could she shed any light on a new employee supposedly hired on December 31 to fill a fiscal position.

At some point after this meeting, Pérez showed up at Santiago's office alone. Santiago reported he seemed upset and was looking for Rosado's office. Admittedly nervous, Santiago tearfully told him she thought Mena was "going to get [Pérez] into a lot of trouble" and that she "was already feeling very bad already because . . . [t]hey were pushing [her] aside and they were doing things behind [her] back." She reported that Pérez "remained silent" and "didn't do anything" before leaving her office for Rosado's.

Santiago's termination followed shortly thereafter. According to Pérez, Santiago's inability to answer any of the questions he asked at the staff meeting "showed [him] that [she] lacked any knowledge of the essentials [of] Head Start's administrative operations or was obstructing the new administration efforts to obtain the status and continue with a healthy operation." Rosado testified that the decision to terminate one of the top positions at Head Start, including the Deputy Director, had to be approved by the Program's Governing Board and that the Parents Committee had to be notified. At a monthly Board of Directors meeting held on February 11, Pérez discussed his concerns about Head Start and asked the Board to terminate Santiago. According to Pérez, he had only decided the morning of the meeting to ask the Board to take this personnel action. In his hearing testimony, he told the district court that he decided to terminate Santiago's contract for several reasons: (1) because, when probed, she did not have a plan to face Head Start's current crisis of enrollment and problems with financial reporting; (2) she lacked the experience or knowledge to fulfill the responsibilities of her role; (3) her position as Deputy Director was not needed given the impact of COVID-19 on the demand for services and he was working out how many staff employees the Program would ultimately need to dismiss given the significant drop in enrollment; and (4) she was not proficient in English when

this had been one of the minimum requirements for the position and she had attested in her job application that she spoke or wrote in English.[6]  In Pérez's eyes, this lack of language proficiency, in particular, resulted in the mis-entering of program data and the subsequent jeopardy and loss of Head Start grant funds.  In a radio interview Pérez gave for a local radio station in early March, amidst a discussion of the problems at Head Start he had inherited when he took office, he stated that Santiago had been hired without proper qualifications at a time when the Program couldn't justify hiring a Deputy Director under the governing regulations due to flagging enrollment.

After the February 11 Board meeting but prior to Santiago receiving word that she was to be dismissed from her position, Mena wrote a memo to all staff announcing that another Head Start employee now had the exclusive authority to sign all reports, documents, certifications, etc., effectively removing Santiago's authority to sign documents as Acting Director on Quiñones-Figueroa's behalf while he was on leave.

On February 26, Santiago received notice of her termination via a letter hand delivered to her by the Municipality's Human Resources Director.  The letter stated that "[t]he Governing Board, at a meeting held on February 11th of 2021

_____

[6] When Santiago testified at the hearing she said she could speak some English, with help.

- 14 -

and upon my request as Mayor and President of [the Governing] Board, unanimously removed and dismissed (you as) Deputy Director of the Head Start Program, effective Friday, March 5th of 2021."

In the week following her termination, several big changes occurred at Utuado's Head Start Program. For one, Quiñones-Figueroa resigned as Director. For another, between the first day of the preliminary injunction hearing (May 17) and the second day (June 9), Pérez dismissed 31 additional employees, most of whom had been appointed by the former mayor. While the Municipality eventually hired a new Director and a Fiscal Specialist, it did not hire another Deputy Director, effectively eliminating the position.

In March 2021, Santiago initiated this litigation by filing her verified complaint against the Municipality of Utuado, alleging political discrimination and due process claims as well as violations of several commonwealth laws. In her motion for preliminary injunction, she requested the court order the Municipality to reinstate her to Deputy Director and to enjoin it from further violating her rights.[7]

---

[7] Santiago's motion for preliminary injunction focused primarily on her federal constitutional claims; her claim of rights violations pursuant to the laws and Constitution of the Commonwealth of Puerto Rico were not separately argued as a basis for the injunctive relief she sought, and the district court focused exclusively on the federal constitutional claims.

Soon after the conclusion of the fourth and final day of testimony, the magistrate judge to whom this case had been referred issued a Report & Recommendation ("R&R") concluding that Santiago had not shown a likelihood of success on the merits on either of her constitutional claims and recommending that the district court deny her motion for preliminary injunction. Santiago objected to the R&R, contending the magistrate judge failed to address certain facts and placed the wrong emphasis on others, leading to the wrong conclusion about Santiago's likelihood of success on her claims. The district court adopted the R&R in its entirety and denied the motion, briefly noting that, in her objection, Santiago had simply rehashed the same arguments that she had put forth in her motion.

This court has jurisdiction over Santiago's interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1).

## Discussion

### Standard of Review and Preliminary Injunction Standard

This court reviews the district court's denial of a motion for preliminary injunction for abuse of discretion. Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38, 42 (1st Cir. 2024); see also Penalbert-Rosa v. Fortuno-Burset, 631 F.3d 592, 597 (1st Cir. 2011) (acknowledging the abuse-of-discretion standard of review for denial of requested injunctive relief in a political discrimination claim but deferring to discussion of Rule 12(b)(6) motion to dismiss). Using this deferential standard,

"[w]e review the district court's factual findings for clear error and its legal conclusions de novo." Ocean State Tactical, LLC, 95 F.4th at 42-43 (alteration in original) (internal quotation marks omitted) (quoting Together Emps. v. Mass Gen. Brigham Inc., 32 F.4th 82, 85 (1st Cir. 2022)).  We must conclude an abuse of discretion occurred when a district court "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Joseph v. Lincare, Inc., 989 F.3d 147, 155 (1st Cir. 2021) (quoting Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 572 U.S. 559, 563 n.2 (2014)).

When a party seeks a preliminary injunction, the district court considers four long-established elements:  (1) "the probability of the movant's success on the merits" of their claim(s); (2) "the prospect of irreparable harm absent the injunction"; (3) "the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does)"; and (4) "the effect of the court's action on the public interest." Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003); see Me. Forest Prods. Council v. Cormier, 51 F.4th 1, 5 (1st Cir. 2022).  The movant's likelihood of success on the merits is the element that "weighs most heavily in the preliminary injunction calculus," Cormier, 51 F.4th at 5 (quoting Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020)).

## Fourteenth Amendment Due Process Claim

The district court concluded Santiago was not likely to succeed on the merits of her due process claim because her initial hire to Head Start was contrary to Puerto Rico law and, as a result, she did not have the requisite property interest in her employment. Santiago puts forth only one argument challenging this conclusion: She says the district court applied the wrong Puerto Rico law when it drew this conclusion and that the correct law would have yielded a different conclusion. As we explain below, however, her argument is waived. To make our holding clear, it will be helpful to start with the broad principles for such a due process claim in the employment context and describe the district court's reasoning behind its conclusion.

The Fifth and Fourteenth Amendments to the United States Constitution prohibit the deprivation of property by the federal or state government without due process of law. U.S. Const. amend. V, amend. XIV. In the workplace arena, "[t]he Constitution affords procedural due process protections to government employees who possess a property interest in continued public employment," Casiano-Montañez v. State Ins. Fund Corp., 707 F.3d 124, 129 (1st Cir. 2013) (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)), meaning that, "[u]nder the Fourteenth Amendment, a public employee who possesses a property interest in continued employment cannot be discharged without due process of law,"

Gonzalez-De Blasini v. Fam. Dep't, 377 F.3d 81, 86 (1st Cir. 2004). A due process claim will fail, however, if the plaintiff cannot first establish they have a protected property interest in the employment position in question. García-González v. Puig-Morales, 761 F.3d 81, 88 (1st Cir. 2014). "Property interests are creatures of state law, and under the laws of Puerto Rico, public employees who lawfully hold career positions have a protected property interest in continued employment in those positions." Casiano-Montañez, 707 F.3d at 129 (citing Costa-Urena v. Segarra, 590 F.3d 18, 27 (1st Cir. 2009)). That said, "[e]mployees whose hiring contravene[s] Commonwealth laws and regulations . . . are not vested with a property interest in their career positions." Id. (citing Costa-Urena, 590 F.3d at 27). "'Their career appointments are null and void ab initio' and no due process protections attach." Id. (cleaned up) (quoting Kauffman v. P.R. Tel. Co., 841 F.2d 1169, 1173 (1st Cir. 1988)). This court has also acknowledged that transitory employees working pursuant to a contract with a specific term of employment have a property interest in their employment during the term of the contract but not beyond the expiration of the fixed term of the contract.[8]  See Borges Colón

---

[8] We have previously explained the distinctions between types of municipal employee classifications as follows: "(1) regular employees, occupying permanent or career municipal positions, (2) transitory employees, appointed without the usual personnel screening procedures (e.g., postings and competitive examinations), but subject to periodic renewals at the expiration

- 19 -

v. Román-Abreu, 438 F.3d 1, 10-11, 18 (1st Cir. 2006); Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 94 (1st Cir. 1997); Acevedo-Diaz v. Aponte, 1 F.3d 62, 65 n.1 (1st Cir. 1993). For these types of employees, "[s]tate statutory law is [but one] source of 'property' interests in employment. For procedural due process purposes, it is well settled that an employee's 'property right' in her job may be established by contract." See Rivera-Flores v. P.R. Tel. Co., 64 F.3d 742, 750 & n.7 (1st Cir. 1995) (citation omitted). Both the district court and the parties proceeded as if Santiago, as a transitory employee, had a property interest in her position.

Even so, the district court concluded Santiago had not demonstrated a likelihood of success on the merits of her due process claim because it determined she should never have been appointed to the Deputy Director position in the first place. The district court concluded Santiago's appointment to the Deputy Director position had been contrary to the merit principle reflected in Puerto Rico Law No. 107-2020 applicable to hiring

---

of their fixed terms, and (3) contractual workers, hired for fixed terms under federally funded programs (e.g., HUD) administered by the City." Acevedo-Diaz v. Aponte, 1 F.3d 62, 65 n.1 (1st Cir. 1993) (internal quotation marks omitted). The Municipality hired Santiago after she applied for a job that had been posted and her employment contract for the federally funded Head Start program is titled "Transitory Services Contract," indicating that the line between transitory and contract employees may in fact be perforated, with some employees falling into both categories at the same time.

(more on this law in a moment) because she had not met the minimum requirements for the Deputy Director position. As the district court reasoned, on the March 2020 closing day for applications to the position, Santiago submitted only a partially completed application -- demonstrated by the July 2020 date reflected on two of the required documents for a complete application listed on the job posting (the "[c]ertificate of [g]ood [c]onduct and/or [c]riminal [r]ecord" and "[c]ompliance with the applicable provisions of the Income Tax Act, as amended, regarding the filing of tax returns for the four (4) years prior to the application"). The district court also explained that Santiago's apparent lack of knowledge about some "fundamental operational topics . . . . bolster[ed] the Municipality's contention that [she] was not qualified to hold the position" and therefore could not have the requisite property interest in her employment contract to win a due process claim.

On appeal, Santiago insists she did have a property interest in her employment, one created by the renewed transitory contract, and the Municipality deprived her of this interest when it summarily terminated her employment two months into the contract's term. In her objection to the R&R, Santiago challenged the magistrate judge's conclusion regarding the incomplete application but she does not press that same argument on appeal. Instead, she debuts an argument that the district court applied an

incorrect Puerto Rico law when it concluded that her initial appointment as Deputy Director was unlawful because, according to her, the law on which the district court relied (Law No. 107-2020) did not come into effect until a few weeks after her initial appointment. The district court should instead, says Santiago, have applied federal regulations governing Head Start and Act 81 (a law which was either partially or completely repealed when Law No. 107-2020 went into effect). Santiago contends she met the minimum requirements for the Deputy Director position when she was initially hired and that her appointment complied with Puerto Rico law, including its "merit principle," as well as with the Head Start regulations.[9] And because she has a cognizable property

---

[9] A quick word about each of these laws and the "merit principle." The district court, citing Law No. 107-2020, stated that "the human resources recruitment system of municipalities is governed by the merit principle so as to promote excellence in public service based on equity, justice, efficiency, productivity, and without discrimination on the basis of, among others, political ideals." See Article 2.042 of the Puerto Rico Municipal code, Puerto Rico Law Number 107-2020, as amended, 21 P.R. Laws Ann. §§ 7001 et seq. ("Law No. 107-2020") and specifically 21 P.R. Laws Ann. § 7231.

Act 81 (from the Autonomous Municipalities Act of 1991) provided in part that

[t]he municipal public service shall be governed by the merit principle to ensure that those who serve the Municipal Government are the fittest. The Municipal Personnel service shall ensure that all career employees of the municipality shall be selected, trained, promoted, retained and treated with consideration of their merits and capability with regard to their employment, without any discrimination for race, color,

- 22 -

interest in her transitory employment contract for the duration of its tenure, Santiago leans on her contention that she was afforded no due process rights adjacent to her termination, i.e., she was given no specific reason for her dismissal nor any opportunity to contest it. As a result, she says, the district court's conclusion that she had no likelihood of success on the merits of her due process claim was an "abuse[ of] its discretion."

A threshold obstacle stands in the way of Santiago's argument. As we noted and as the Municipality correctly counters in its brief, Santiago is raising this wrong-law-applied argument for the first time on appeal. She did not contradict the Municipality's assertion, say for instance, by filing a reply brief to protest this lack of preservation asseveration. And our review of the record reveals she did not mention -- in either her written

---

sex, birth, age, social origin or condition, nor political or religious beliefs.

1991 Laws of Puerto Rico 570-71. Act 81 defined the merit principle as the "concept on which basis all public employees shall be selected, promoted, retained and treated in all matters concerning their employment based upon their capability and without discrimination." Aponte-Ramos v. Álvarez-Rubio, 783 F.3d 905, 907 (1st Cir. 2015) (quoting P.R. Laws Ann. § 1461(42)).

According to the Municipality's briefing, "[o]n August 13, 2020, the Puerto Rico Legislature abrogated the Law of Autonomous Municipalities by way of the Municipal Code, 21 P.R. Laws Ann. § 7001, et seq." The Municipality also states that, "[l]ike the Autonomous Municipalities Act, the more recent statute now governs the organization, administration and operation of Puerto Rico municipalities. A significant amount of the provisions in the old statute remained unchanged."

or oral arguments to the district court -- Act 81 or the federal regulations governing Head Start, even though the Municipality discussed the asserted applicability of Law No. 107-2020 throughout its written opposition to the motion for preliminary injunction. Nor did she object to the R&R on this basis to the district judge. As a result, we deem the argument waived. See Marcano-Martínez v. Cooperativa de Seguros Múltiples de P.R., 991 F.3d 336, 339 (1st Cir. 2021) ("Delay in raising arguments wastes time and money; absent unusual circumstances, arguments raised for the first time on appeal should fail almost automatically.").

We would usually say no more on a waived issue, but there is one additional important point to make because, had Santiago not waived her argument, our consideration of its merits would have been stymied by Santiago's failure to provide us with a certified translation of Law No. 107-2020. We explain. Santiago alleges in her complaint that her initial contract started on August 1, 2020, and she argues that, with Law No. 107-2020 coming into effect on August 14 of that year, Act 81 governed her initial hire (as well as how she -- in her mind -- definitely met the requirements under Act 81, including pursuant to the federal regulations governing Head Start). There is, however, no evidence in the record to prove her precise hire date. All we know is she submitted her application on the deadline in March and her hiring process completed sometime in August. This means that each law

- 24 -

may have been in effect over the course of her hiring process and Law No. 107-2020 was certainly in place when she and the Municipality signed her 2021 employment contract. Add to this that even if we did know with certainty that one law was in place over the other, Santiago has not told us how Act 81 substantively differs from Law No. 107-2020 (if at all in a meaningful way when both laws seem premised on the merit principle -- Santiago herself acknowledges the merit principle as the basis for Act 81), or how application of her preferred law would change the outcome. All this to say that any consideration of Santiago's arguments on the merits would need to include an examination of both laws to suss out the differences between the two, but we would be stuck at the gate because the new law has yet to receive an official translation into English, and Santiago did not provide a certified translation for our review. See 1st Cir. L.R. 30(e).

With that, we move on to Santiago's political discrimination claim.

### First Amendment Political Discrimination Claim[10]

Santiago challenges the district court's conclusion that she had not shown political animus drove the Municipality's

---

[10] There is no doubt that a former employee can have a valid claim for political discrimination under the First Amendment even when there is no valid or meritorious claim for a due process violation. See Acevedo-Diaz, 1 F.3d at 65 n.1 ("While their lack of a property interest in their employment positions generally precludes due process claims for a politically discriminatory

decision to terminate her employment. As with Santiago's due process claim, it will be helpful to start our discussion of her political discrimination claim by setting forth some broad legal principles. "Government officials are forbidden by the First Amendment from taking adverse action against public employees on the basis of political affiliation, unless political loyalty is an appropriate requirement of the employment." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 13 (1st Cir. 2011) (citing Rutan v. Republican Party of Ill., 497 U.S. 62, 75-76 (1990)). A plaintiff claiming political discrimination establishes a prima face case by proving four elements: "(1) that the plaintiff and defendant have opposing political affiliations, (2) that the defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political affiliation was a substantial or motivating factor for the adverse employment action." Id. (quoting Lamboy-Ortiz v. Ortiz-Vélez, 630 F.3d 228, 239 (1st Cir. 2010)); Hatfield-Bermudez v. Aldanondo-Rivera, 496 F.3d 51, 61 (1st Cir. 2007) (referring to these four elements as the prima facie case); Peguero-Moronta v. Santiago, 464 F.3d 29, 48 (1st Cir. 2006). "Proving that political affiliation was a substantial or motivating factor in an adverse employment decision requires more than 'merely juxtaposing a protected characteristic—

_____

dismissal, First Amendment discrimination claims are not precluded."); see also Borges Colón, 438 F.3d at 11.

someone else's politics—with the fact that the plaintiff was treated unfairly.'" Peguero-Moronta, 464 F.3d at 45 (cleaned up) (quoting Padilla-García v. Guillermo Rodríguez, 212 F.3d 69, 74 (1st Cir. 2000)). "The Supreme Court has cautioned that the mere fact that an adverse action was taken after an employee exercises First Amendment rights is not enough by itself to establish a prima facie case." Id. (citing Bd. of Cty. Comm'rs v. Umbehr, 518 U.S. 668, 684-85 (1996)).

As the district court recognized, the first three elements are not in dispute here: Santiago supported the PDP; Mayor Pérez, who is a member of the NPP, knew she supported the PDP; and she was terminated before the end of her employment contract. The district court concluded Santiago hadn't provided enough evidence to show the fourth element -- that "political discriminatory animus was at the center of the decision to terminate her employment" -- and therefore had not shown likelihood of success on a prima facie claim of political discrimination.

On appeal, Santiago asserts she did provide "specific facts necessary" to show beyond mere speculation that her political affiliation with the PDP was a substantial or motivating factor for her termination, meaning that political discriminatory animus drove the decision to end her employment with Head Start and the district court abused its discretion by concluding otherwise. As support from the record, she highlights Pérez's contact with her

prior to the election (the missed phone call, the text, and phone conversation), Pérez's withdrawal (prior to her termination) of her authorization to sign official documents on behalf of the Head Start Director who was out on sick leave, Pérez announcing his longtime friend and mentor as "in charge" of Head Start in a volunteer capacity and who immediately took actions to usurp her authority as Deputy Director, Pérez's decision to terminate her employment without -- Santiago says -- the required approval of a legally formed Governing Board or the Parents Committee,[11] and Pérez's comments during a radio interview given a few weeks after

---

[11] Some additional details from the record are needed here to fully articulate what Santiago has written in her briefing to us on this point. Santiago contends (as she did below) that the Governing Board was not properly formed at the time of the February 11 meeting when Mayor Pérez sought the Board's permission to terminate her contract and dismiss her because the new members of the Board were not "duly appointed" pursuant to "Ordinance 29." At the hearing, Mayor Pérez testified he had appointed new members to the Governing Board after he took office and that two of these members were municipal legislators and two of these members were "from the community" and current public sector employees. Mayor Pérez acknowledged that Ordinance 29 of the Municipality of Utuado specified that the Head Start Governing Board members had to all also be municipal legislators but that his administration was in the process of amending this Ordinance because the soon-to-be updated Municipal Code (see note 9, supra) allowed changes to the Board's composition and he "decided to constitute the Board according to the . . . new Municipal Code." Santiago also argued that the Parents Committee had to approve her dismissal but that Pérez admitted he had not sought their approval. Santiago does not provide any regulations stating this requirement, and we note that Rosado testified that the Parents Committee merely needs to be notified of any personnel changes (and they were by the cc to them on Santiago's letter of termination). In Santiago's eyes, this all provides circumstantial evidence of discriminatory animus on Pérez's part.

her dismissal."[12]  Santiago does not, however, attempt to or actually connect the dots to tie any of these just recited factual allegations to our case law in order to support her argument that this was sufficient to show a likelihood of success on the merits that her political support for the PDP was a substantial factor in Pérez's decision to terminate her employment.[13]

The Municipality counters that Santiago's appellate arguments reflect her disagreement with the district court's view of the evidence but that the district court's analysis was correct, lacking clear error or any abuse of discretion.  The Municipality argues (and Santiago acknowledges) that the short span of time between Pérez taking office and Santiago's termination is not

---

[12] A little additional context will be helpful here too.  In the March 10 radio interview mentioned briefly supra, the radio host asked Pérez to respond to criticism in a press release from another political party's legislator about Pérez's response to the Head Start crisis with the managing office (including bringing Mena into the fold) and the way in which Pérez was changing the composition of and selection process for the members of the Program's Governing Board.  Part of Pérez's response included a comment that the legislator who had issued the accusatory press release was actually a supporter of the former mayor and that she and his party "were carrying [Irizarry's] briefcase.  [He] is no longer there, and they've to get their payback."  Pérez also discussed Santiago's dismissal during this interview and because he did she urges that this statement is evidence that political affiliation was a substantial factor in her termination.

[13] The single case she cites amidst her discussion of the facts she believes are in her favor is focused on whether a deviation from the usual termination procedure was evidence of pretext for a retaliation claim, not a political discrimination claim as we have before us.  See Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 68-69 (1st Cir. 2008).

sufficient on its own, and it refutes each of the pieces of evidence Santiago argued should have tipped her across the line from speculative to indicative of likelihood of success on the merits. For example, it says that the text messages sent during the campaign season as well as the phone conversation did not show his political animus but instead, his disdain for the acts of electoral fraud he believed had occurred. The radio interview, says the Municipality, did not show political animus towards Santiago but frustration at the way the previous administration had run Head Start. Finally, the Municipality asserts that Santiago was not terminated as a result of political animus but because she lacked the minimum requirements for the Deputy Director position as well as the knowledge required to execute the responsibilities of the position. As for Santiago's argument that the Head Start Board was not properly constituted at the time it approved her proposed termination or that the Parents Committee was deprived of an opportunity to weigh in, the Municipality points out that Santiago does not provide any indication that the approvals from these bodies were a standard operating procedure or practice at Head Start such that this alleged deviation could be evidence of animus.[14]

---

[14] We note again that Santiago did not avail herself of the opportunity to file a reply brief to counter any of these contentions.

- 30 -

In our view, the record does not show that the district court clearly erred in its interpretation of the evidence before it or abused its discretion by concluding that Santiago's affiliation with or support of the PDP was not a substantial factor in Pérez's decision to terminate her contract mid-term. The only politically-inflected exchanges between Pérez and Santiago, as far as the record reveals, are Pérez's text messages to Santiago asking for her support and warning her to avoid any shenanigans, and his telephone conversation with her about election irregularities. But these events occurred months before he took office, and nothing about his conduct after becoming mayor shows that his actions towards Santiago were motivated by political ill-will rather than appropriate managerial considerations.

In the first weeks in his role as mayor, he discovered Head Start was in quite a bad spot vis-à-vis the managing office in New York and the events described and documented on the record reveal the quick steps he tried to take to get to the bottom of the problem so he could stop the rescission of the grant funds. That the Head Start Director needed immediate medical leave did not help Pérez's efforts but he did follow Quiñones-Figueroa's suggestion and appointed Santiago Acting Director before discovering, soon thereafter, that it appeared she had neither the knowledge nor the access to required databases to help pull the Program out of its troubles. While Pérez, through Mena, rescinded

Santiago's authority to execute official, Program-related documents before notifying her of her dismissal, the record shows that the memo announcing the change of signatory authority occurred after Pérez received approval to terminate her contract, indicating a logical managerial decision even if not tactfully executed.

To be sure, Santiago's termination letter provided no explanation for her dismissal, but such lack of notice is not alone dispositive. To show a likelihood of success on this "substantial or motivating factor" element, she needs more than a "[m]ere[] juxtaposi[tion]" of her support for the PDP with any arguably unfair treatment she experienced in the lead up to and including her termination. Peguero-Moronta, 464 F.3d at 45 (first alteration in original). Santiago acknowledges this requirement in her brief to us. But she has not provided any evidence such as proof of a highly charged political office atmosphere or evidence of comments by Pérez or any colleagues at Head Start that the administration wanted to focus on dismissing or laying off employees who were known supporters of the PDP. See Borges Colón, 438 F.3d at 11, 18, 22 (highlighting evidence that plaintiff's replacement was from a different political party, the mayor made comments about "get[ting] rid" of opposing party supporters who were employed in the office, and refutation of the stated reason for non-renewal of plaintiff's employment contract to affirm a jury verdict on a

political discrimination First Amendment claim). Moreover, she makes no argument that the Head Start employees laid off after Santiago's termination were PDP supporters.

The final problem is that, as we mentioned above, Santiago hasn't pointed us to any cases indicating that, based on our law governing political discrimination claims, the district court made the wrong call about her likelihood of success on the merits. See United States v. De La Cruz, 514 F.3d 121, 133 (1st Cir. 2008) (rejecting an appellant's argument in part for not citing to any cases which specifically supported the articulated appellate argument and for only citing cases which supported general propositions relevant to the constitutional issue at hand). In all, the district court's conclusion that Santiago's support for the PDP was not a substantial factor in the termination decision is well-supported by the record and Santiago has not provided any reasons based on the record or case law to indicate that the district court abused its substantial discretion.[15]

---

[15] Santiago also spills some ink arguing that the district judge did not conduct a proper de novo review of the motion for preliminary injunction because the judge incorrectly characterized Santiago's objection to the R&R as a "rehash" of her motion. As Santiago herself cites, Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1) govern the district judge's review of a "properly objected to" "magistrate judge[] disposition[,]" but the rule and statute only instruct that the district judge's review is de novo and that the judge has a range of options, including to "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." The Rule does not instruct district judges

- 33 -

## Conclusion

Given our conclusions above about Santiago's challenges to the district court's conclusions about the likelihood of success on the merits of her two claims, we need not explore the other factors required to secure a preliminary injunction. The denial of Santiago's motion for preliminary injunction is <u>affirmed</u>. Each side to bear their own costs.

---

that they must explain their reasoning at all or in any degree of detail. Here, the district judge stated that, after considering Santiago's objections and reviewing the record de novo, he concluded the R&R was "well-grounded in both fact and law" and adopted the R&R in its entirety for the reasons stated within the R&R. As with Santiago's arguments before us on her two constitutional claims, her objection to the R&R is devoid of any attempt to demonstrate the R&R reflected the application of the wrong laws governing the two claims or that, pursuant to our governing case law, the R&R drew the incorrect legal conclusions regarding her likelihood of success on the merits of her claims. Beyond general statements of law, the objection simply argued the facts. After reviewing the record and considering the case law, we conclude there is no indication that the district judge misread the record or misapplied the applicable law.